MEYER et al. v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. February 15, 1915. Rehearing Denied March 18, 1915.)

No. 2413.

1. CRIMINAL LAW ⟨key⟩150—LIMITATION OF PROSECUTIONS—COMMENCEMENT OF PERIOD OF LIMITATION—CONSPIRACIES.

Limitations did not run against a prosecution for conspiring to defraud the United States by selling zinc to it at an exorbitant price, and securing the approval of the account and the issuance and delivery of a paymaster's check therefor, until credit was given on the check by the bank of deposit of public funds against which the paymaster was authorized to check, or until it was paid by the national treasury, as a conspiracy attended with appropriate acts and conditions may consist of a continuing offense, and while the mere continuance of the result of a crime does not continue the crime, the acts of the conspirators in negotiating the check and securing its payment by the government were designed and calculated to effect the object and purposes of the scheme to defraud, and were not acts of private arrangement between the conspirators; the government not being defrauded while it was still within its power, by stopping payment, to prevent the misappropriation of the public funds.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 274, 275; Dec. Dig. ⟨key⟩150.]

2. CRIMINAL LAW ⟨key⟩338—EVIDENCE—CONSPIRACY TO DEFRAUD.

On a trial for conspiracy to defraud the United States by selling zinc to it at an exorbitant price, evidence as to sales of zinc by the conspirators to various purchasers for some time prior to the sale to the government was admissible to show the market value of the zinc, and that it was sold to the government at an exorbitant figure.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 752, 753, 755, 756, 787, 788, 801, 855; Dec. Dig. ⟨key⟩338.]

In Error to the District Court of the United States for the Northern Division of the Western District of Washington; Jeremiah Neterer, Judge.

Edwin F. Meyer and another were convicted of conspiracy to defraud the United States, and they bring error. Affirmed.

Edwin F. Meyer was principal clerk in the office of the general storekeeper of the United States navy yard, Puget Sound, Wash., with authority to make requisitions for the purchase of supplies for the use of the navy yard. J. A. Kettlewell was chief clerk to the navy pay officer in the United States navy pay office at Seattle, Wash., with authority to send out proposals for the purchase of supplies to different merchants, to examine bids, and to recommend to the paymaster of the United States navy pay office the acceptance or rejection of such bids. Emar Goldberg was manager of the Seattle branch of the Great Western Smelting & Refining Company, of San Francisco, Cal. W. A. Corder was manager of W. A. Corder Company, and E. Silverstone was engaged in conducting a hotel in Seattle.

The indictment alleges in effect that Meyer and Kettlewell (setting out in great detail their official positions and the duties and authority attached thereto), on or about the 2d day of June, 1908, conspired and confederated with Goldberg, Corder, and Silverstone, and certain other evil-disposed persons, "to defraud the United States of divers large sums of money" by means of a certain fraudulent scheme, which scheme was first devised and concocted and put in operation about the 1st day of April, 1908, and was continuously in process of execution until and including the 2d day of June, 1908. The scheme is then set out with much detail, and in brief consisted in Meyer's causing to be issued a requisition for the purchase for the use of the navy

yard of a large quantity of zinc, rolled sheet, boiler plates, causing to be placed in said requisition, as the estimated cost price of said zinc, a price in' excess of the fair market value thereof, and causing to be fixed by such requisition so short a time for the delivery of the zinc that none but merchants of Seattle and vicinity could comply therewith, and, when said requisition should in due course reach the United States navy pay office, in Kettlewell's sending out proposals to a list of merchants in Seattle and vicinity, to contain the names of no merchants other than the Great Western Smelting & Refining Company and W. A. Corder Company, both of Seattle, and Fowler Metal Company, of San Francisco, except such as Kettlewell knew would be unable to furnish the zinc, or to bid for such contract, and in so arranging that competition would be simulated only, and not real, and that an exorbitant price should be bid and accepted, so that an unreasonable profit would be realized in furnishing the commodity, which unreasonable profit so fraudulently realized the said Meyer, Kettlewell, and Goldberg, acting as agent of the Great Western Smelting & Refining Company, Corder, acting for W. A. Corder Company, and E. Silverstone, "should appropriate and convert to their own use," and which should be divided among them in some proportion to the grand jury unknown.

The indictment further charges that several overt acts were committed in furtherance of the conspiracy, as follows: That on or about June 1, 1908, Kettlewell delivered to Goldberg a certain check of date May 26, 1908, for $7,417.09, signed by "Robert H. Orr, Paymaster U. S. N.," and on the same date delivered the same check to Silverstone; that on or about the 1st day of June, 1908, Goldberg, having the check in his possession, wrote on the back thereof the words: "Pay to the order of E. Silverstone. Fowler Metal Co., Per E. S. Fowler, Treas. & Mgr."—and caused it to be delivered to E. Silverstone; that on or about the same date E. Silverstone, having the check in his possession, wrote upon the back thereof an indorsement, "E. Silverstone," and deposited it with the First National Bank to his credit; that on or about the same date Silverstone issued his check on the First National Bank, payable to the order of the Great Western Smelting & Refining Company, in the sum of $7,417.09, and delivered the same to Goldberg; that on or about the 1st day of June, 1908, Goldberg, having the last-named check in his possession, indorsed the name of the company thereon, and deposited the same to his credit in the National Bank of Commerce of Seattle.

Evidence was adduced at the trial tending to establish the conspiracy alleged, at least as to Meyer, Goldberg, and Kettlewell. The check designed to be delivered in payment for the zinc bears date May 26, 1908, and is in form: "Pay to Fowler Metal Co., or order, seventy-four hundred and seventeen 09/100 dollars ($7,417.09)," signed "Robert H. Orr, Paymaster U. S. N." It was delivered at the office of the paymaster by Kettlewell, to either Silverstone or Goldberg (there is some dispute as to which), on the day it bears date, probably in the evening, after banking hours. Goldberg, at least, soon came into possession of the check, and held it until Monday, June 1st. He proposed to Silverstone that the latter take the check and give to the Great Western Smelting & Refining Company his personal check in exchange, which was agreed to. The check was then by Goldberg indorsed with the words: "Pay to the order of E. Silverstone. Fowler Metal Company." Silverstone, not having funds in bank to his credit to check against to the amount of the government check, insisted that he should have the latter check deposited to his credit before delivering his own check to Goldberg; so he took the government check to his bank (The First National) in Seattle, and attempted to make the deposit, writing out the deposit slip for the bank. When the teller observed the indorsement by the Metal Company, however, he refused to accept it, for the reason that such indorsement did not show by whom it was made. Thereupon Silverstone returned with the check to Goldberg, who added to the indorsement the words "Per E. S. Fowler, Treas. & Mgr." On returning to the bank, Silverstone obtained the desired credit, and then gave his personal check to Goldberg for a like amount. The Metal Company check was cleared on the Seattle National Bank on June 2, 1908, and by that bank charged against Paymaster Orr, or the funds there on deposit in his name as paymaster.

220 F.—51

It should be further explained that Fowler Metal Company was supposed to be a subsidiary company of the Great Western Smelting & Refining Company, that Silverstone put in the bid for the Metal Company at Goldberg's request, and that company was the successful bidder; hence the reason for issuing the check payable to it. The Great Western Smelting & Refining Company, however, as Goldberg explains, "was entitled to every cent of that money. The Great Western Smelting & Refining Company had delivered the entire amount òf the material called for on that proposal."

Goldberg insists that Kettlewell delivered the check to him, and not to Silverstone, and relates that Kettlewell threatened to hold it up at first, and did not give it to him until after he (Goldberg) had gone out and consulted his counsel. As explanatory as to why he did not dispose of the check sooner, he says: "After we got the check, I was afraid that perhaps they would reject the zinc, or do something. I didn't know what authority he had, or what he could possibly do; so I took the check down to the office, and we kept it there for four or five days, thinking perhaps that the paymaster or some one might call us up and tell us to return the check, or tell us the material was going to be rejected or returned, or something; and it was on Friday or Saturday that finally I decided we would deposit the check, and I called up Mr. Silverstone and asked him to come down town so he could deposit the check, because he had originally made out the bid." And he further explained, on cross-examination: "Because I was holding the check to see if anything would be done by the navy pay office about stopping payment or anything of that kind."

Kerr & McCord, Morris & Shipley, and Andrew R. Black, all of Seattle, Wash., and Bert Schlesinger, of San Francisco, Cal., for plaintiffs in error.

Clay Allen, U. S. Atty., and Winter S. Martin, Asst. U. S. Atty., both of Seattle, Wash., for the United States.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

WOLVERTON, District Judge (after stating the facts as above). [1] The strong contention of counsel for defendants is that the object and purposes of the conspiracy ended with the delivery of Paymaster Orr's check to Goldberg or Silverstone on May 26, 1908, and that whatever was done thereafter in the disposal of the check by and between the alleged conspirators was mere private arrangement between them by way of settlement, and was not potent in any way in effectuating the object and purposes of the alleged conspiracy, and therefore, the indictment having been found and returned May 31, 1911, the offense charged was barred by the statute of limitations of three years from the date of commission. The contention is thought to be the more persuasive inasmuch as it is alleged, among other things, by the indictment, indicating in part the things that Kettlewell should do in carrying out the unlawful scheme, as follows:

"And said J. A. Kettlewell should recommend and secure the approval of the account as shown by a certain certified bill to be filed, and caused to be filed, by said E. Silverstone with the United States navy yard, Puget Sound, Washington, purporting to be the certified bill of the Fowler Metal Company, showing delivery of said zinc, rolled sheet boiler plates, and the acceptance of same at said navy yard, Puget Sound, and that none of said zinc, rolled sheet, boiler plates had been paid for, and should recommend and secure the issuance by the paymaster at the United States navy pay office at Seattle, Washington, of a check payable to the order of the said Fowler Metal Company for the amount appearing to be due the said Fowler Metal Company

according to the account so to be rendered as aforesaid, and should arrange to have said check delivered to said E. Silverstone or said Emar Goldberg."

In contemplation of section 5440, R. S., a conspiracy may be entered into "to defraud the United States in any manner or for any purpose." The indictment is drawn under this clause. That a conspiracy attended with appropriate acts and conditions may consist of a continuing offense has been settled by adjudication of the Supreme Court. We quote the language of Mr. Justice Holmes in United States v. Kissel, 218 U. S. 601, 607, 31 Sup. Ct. 124, 125 (54 L. Ed. 1168):

"The argument, so far as the premises are true, does not suffice to prove that a conspiracy, although it exists as soon as the agreement is made, may not continue beyond the moment of making it. It is true that the unlawful agreement satisfies the definition of the crime, but it does not exhaust it. It also is true, of course, that the mere continuance of the result of a crime does not continue the crime. United States v. Irvine, 98 U. S. 450 [25 L. Ed. 193]. But when the plot contemplates bringing to pass a continuous result, that will not continue without the continuous co-operation of the conspirators to keep it up, and there is such continuous co-operation, it is a perversion of natural thought and of natural language to call such continuous co-operation a cinematographic series of distinct conspiracies, rather than to call it a single one. Take the present case. A conspiracy to restrain or monopolize trade by improperly excluding a competitor from business contemplates that the conspirators will remain in business and will continue their combined efforts to drive the competitor out until they succeed. If they do continue such efforts in pursuance of the plan, the conspiracy continues up to the time of abandonment or success. A conspiracy in restraint of trade is different from and more than a contract in restraint of trade. A conspiracy is constituted by an agreement, it is true; but it is the result of the agreement, rather than the agreement itself, just as a partnership, although constituted by a contract, is not the contract but is a result of it. The contract is instantaneous; the partnership may endure as one and the same partnership for years. A conspiracy is a partnership in criminal purposes. That as such it may have continuation in time is shown by the rule that an overt act of one partner may be the act of all, without any new agreement specifically directed to that act."

To the same purpose, see Brown v. Elliott, 225 U. S. 392, 400, 32 Sup. Ct. 812, 56 L. Ed. 1136.

It would seem, therefore, that so long as it may be shown that the conspirators are acting together for the common purpose comprehended by the scheme formed and entered upon with the view to defraud the government, and have, while so acting together, committed some overt act to effectuate the purpose, all within the three years prior to the finding of the indictment, the statute has not run. Lonabaugh et al. v. United States, 179 Fed. 476, 103 C. C. A. 56; United States v. Raley (D. C.) 173 Fed. 159.

It is true that the mere continuance of the result of a crime does not continue the crime. It was so held in United States v. Irvine, 98 U. S. 450, 25 L. Ed. 193, a case where the defendant was indicted for withholding a pension from the person for whom it was obtained. The court was of the opinion that the crime was committed when the money was received and a reasonable time had elapsed for allowing it to be handed over to the pensioner, dependent somewhat upon the circumstances of the case, and that the offense was barred, the indictment having been found practically five years after the defendant had obtained the pension. So it was held in the Lonabaugh Case, which

arose under an alleged conspiracy to defraud the government out of certain public lands, that the conspiracy had served its whole purpose, under the scheme adopted and entered upon for defrauding the government out of such public lands, and was at an end when the patent had been executed and recorded in the office of the General Land Office at Washington, D. C., and that the transfers by deed by individual conspirators to the corporation to which it was designed the lands should be eventually conveyed were not acts to effect the object of the conspiracy. The reasoning of the eminent jurist who announced the decision, which sets forth very clearly the viewpoint of the court, is as follows:

"The subsequent acts (that is, the acts of deeding by individual conspirators to the corporation) are not open to the same objection, for they were the acts of one or more of the conspirators. But were they done to effect the object of the conspiracy; that is, to defraud the United States of the possession and title? This depends upon whether or not that object had been effected before those acts were done. If it had, the answer must be in the negative, because of the obvious inconsistency in treating an object already effected as still requiring something to be done to effect it."

These cases are fairly illustrative of the present situation. The indictment charges that those certain persons named in the indictment conspired "to defraud the United States of divers large sums of money by means of a certain fraudulent scheme," defining the scheme and setting out with much particularity and detail the means by which it was to be accomplished; one of such means being for Kettlewell to secure the approval of the account as shown by a certain certified bill, showing the delivery of the zinc and acceptance at the navy yard, and to secure the issuance of the paymaster's check payable to the order of the Fowler Metal Company, and arrange to have the same delivered to Silverstone or Goldberg. We say it is alleged that this was one of the means employed for defrauding the government out of divers large sums of money, and we inquire: Was the scheme to defraud wholly effectuated by that act? If it was, then the statute will apply, and the defendants ought to go free. If, however, it was not, and the securing of the public money beyond the delivery of the check was required to complete and consummate the fraud contemplated under the scheme adopted, then the statute has not run; for the defendants did not obtain the public funds until credit was extended by the bank in which Orr had the public deposits. The very point was within the mind of Goldberg when he was holding the paymaster's check from the evening of May 26th to the day of May 31st without depositing it for credit. He was holding it "to see if anything would be done by the navy pay office about stopping payment or anything of that kind." It is clear that, if the navy pay office had gotten information of the scheme in the meantime and stopped payment, the government would not yet have been defrauded out of the public money, albeit defendants could have been indicted for conspiracy to obtain the check.

The auditor of the Seattle National Bank, the bank in which Orr kept the public funds, describes how such funds are handled. The money is deposited by the government to Orr's credit, and as demands

arise Orr checks against the account thus created, and his declaration is that a check is never paid until it is accepted by the bank and charged to the account upon the books.

It is unnecessary to go into the authorities to determine whether the issuance of a check and delivery of the same constitutes payment. Our firm conviction is that public funds are not appropriated or converted while there is opportunity on the part of the government to prevent such appropriation, and in this case it was still within the power of the government to stop payment of this check, at least until credit was given for it by the bank of deposit of public funds against which Orr was authorized to check, or it was paid by the national treasury. It follows, therefore, that the acts of Silverstone and Goldberg in negotiating this check and securing its payment by the government were acts not merely of private arrangement between themselves, but designed and calculated to effect the object and purposes of the scheme to defraud the government of its public money, and the statute of limitations had not run when these acts were concluded.

[2] Complaint is further made that the court committed error in allowing evidence to go to the jury as to sales of zinc at various times to various purchasers for the purpose of establishing the reasonable value of the zinc sold to the government. In reality, the testimony was offered and admitted for the purpose of showing that the zinc in question was sold to the government at an unreasonable and exorbitant figure. The testimony consisted in showing the market price of zinc from time to time, running back perhaps as much as six months previous to the transactions attending the sale to the government, and, through an expert accountant, in showing from their own books sales of zinc made by the Great Western Smelting & Refining Company and the W. A. Corder Company, also running back as far as September 4, 1907.

This was an attempt to prove value by the market, which is always admissible. Zinc was being sold on the market in and around Seattle and elsewhere constantly, and the sole purpose of the testimony was to show what that market value was. We find no error in the ruling of the court.

Judgment affirmed.