**C. W. CAYWOOD, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 14417.**

United States Court of Appeals
Ninth Circuit.

Feb. 10, 1956.

Rehearing Denied March 20, 1956.

Writ of Certiorari Denied
June 11, 1956.

See 76 S.Ct. 1051.

Douglas H. Clark, Shute & Elsing,.
W. T. Elsing, Phoenix, Ariz., for appel--
lant.

Jack D. H. Hays, U. S. Atty., Everett.
L. Gordon, Asst. U. S. Atty., Phoenix,.
Ariz., for appellee.

Before STEPHENS, POPE and FEE,.
Circuit Judges.

JAMES ALGER FEE, Circuit Judge..

Under the provisions of the Federal.
Property and Administrative Services.
Act of 1949, 40 U.S.C.A. § 471 et seq.,.
the Administrator of General Services
is authorized to transfer, on the basis of
need, to state departments of education.
such equipment or supplies under the·
control of any federal executive agency
as shall have been determined to be·
surplus. In Arizona, distribution of such·
surplus property to the schools and in--
stitutions was carried out by the Arizona
Educational Agency for Surplus Proper-
ty. Caywood was Assistant Superin-
tendent of Public Information for Ari-
zona. In this capacity, he was author-
ized to sign requisitions for necessary
surplus property. Requisitions were·
made on government DP–2 forms.
These required the donee to certify in
part that the property was destined for
a school, college, or university operated
by the state, and that the property do--
nated would be used solely for education-
al purposes, also, that the request was.
reasonable and proper in view of the·
use to be made thereof.

On January 18, 1954, Caywood and
one Tompkins were indicted,[1] charged

1. "Indictment
"Viol: 18 U.S.C.A. 371 (Conspiracy to
violate 18 U.S.C.A. 1001–False State-
ments; 18 U.S.C.A. 641—Conversion of
Government property, and to defraud the
Government)
"The Grand Jury in and for the District
of Arizona Presents:

"That from on or about April 20, 1949,
to and including the date of this indict-
ment, within the State and District of Ari-
zona, **C. W. Caywood, and Harry Tomp-
kins, defendants** herein, did knowingly,
wilfully, unlawfully and feloniously **con-
spire, confederate and agree together (1)
to commit offenses against the United**

with conspiracy "(1) to commit offenses against the United States of America, and (2) to defraud the United States of America and certain agencies thereof, in

States of America, and (2) **to defraud the United States of America and certain agencies thereof,** in that said defendants conspired to violate 18 U.S.C.A. section 1001, by knowingly and wilfully falsifying, concealing and covering up by tricks, schemes and devices, material facts, making and causing to be made false and fraudulent statements and representations in matters within the jurisdiction of departments and agencies of the United States of America, to wit: The Department of the Army of the United States, the Department of the Navy of the United States, the War Assets Administration, the Surplus Property Board of the United States, the Federal Security Agency, Office of Education of the United States, operating and functioning in the disposal of donable surplus property of the United States pursuant to the Surplus Property Act of 1944, as amended (Public Law 457–78th Congress. 58 Stat. 765, 50 U.S.C.A.App. 1611, et seq.), Public Law 862, 80th Congress (62 Stat. 1202–50 U.S.C.A.App. 1614(a)(b)), Public Law 889–80th Congress (62 Stat. 1233), the Federal Property and Administrative Services Act of 1949—Public Law 152, 81st Congress, 63 Stat. 377, and the regulations duly promulgated thereunder, which falsifications, concealments, and coverings up by tricks, schemes and devices, were as follows, to wit: That with respect to donable surplus property allocable to the Arizona State Department of Public Instruction and applied for by it as the duly designated Arizona state agency for surplus property for distribution to educational institutions in said State of Arizona, the said defendants made and executed false statements and representations to the effect that the property applied for, if allocated, would be distributed 'to eligible educational institutions for educational purposes on the basis of need and utilization' in said State of Arizona, whereas, as the said defendants then and there well knew, it was not intended that such property would be distributed to educational institutions in the State of Arizona, but would be, by the defendants, converted, diverted, and sold to persons and institutions not qualified to receive the same;

"That the making and causing to be made of the false and fraudulent statements and representations, as aforesaid, to an agency or agencies of the United States constituted and was the making and causing to be made of false and fraudulent statements and representations in matters within the jurisdiction of departments and agencies of the United States;

"That the defendants, conspired, confederated and agreed together to defraud the United States of America, and the agencies thereof, by depriving said United States of its right, under the laws and regulations appertaining to the disposal of donable surplus property of the United States to have all of such property disposed of according to the applicable laws and regulations and to defraud the United States by preventing it from distributing its surplus property to eligible educational institutions, and to defraud the United States by diverting and converting its donable surplus property from eligible educational institutions for which allocated to the use of said defendants and others;

"The defendants and co-conspirators in furtherance of said conspiracy and to effectuate the objects thereof, at the times and places stated committed the following overt acts:

"Overt Act No. 1

"On or about November 1, 1949, defendant C. W. Caywood filed, or caused to be filed, with the appropriate agency of the United States Government, Form DP–2, requesting the allocation to the Arizona Educational Agency for Surplus Property of a Quickway truck mounted crane, Serial No. 2646, with attachments.

"Overt Act No. 2

"On or about December 20, 1949, the defendant C. W. Caywood did cause the Arizona Educational Agency for Surplus Property to receive from the United States Marine Corps, Camp Pendleton, California, at Oceanside, California, one Quickway truck mounted crane, Serial No. 2646, with attachments.

"Overt Act No. 3

"On or about October 24, 1950, the defendant Harry Tompkins transferred, or caused to be transferred, one Quickway truck mounted crane, Serial No. 2646, with attachments to Rust Proofing, Inc., an Arizona corporation of Phoenix, Arizona, said transferee not being then and there legally entitled to receive said property as an educational institution.

"Overt Act No. 4

"On or about October 24, 1950, the defendants C. W. Caywood and Harry Tompkins did receive from Rust Proofing, Inc., an Arizona corporation of Phoenix, Arizona, the sum of $4,500.00 in payment for one Quickway truck mounted

that said defendants conspired to violate 18 U.S.C.A. Sec. 1001", "by knowingly and wilfully falsifying, concealing and covering up by tricks, schemes and de-

crane, Serial No. 2646, with attachments, personal property of the United States Government.

"Overt Act No. 5

"On or about June 28, 1950 the defendant C. W. Caywood filed, or caused to be filed with the appropriate agency of the United States Form DP–2 requesting that one International Harvester Company TD–14 Tractor, Serial No. TDF 6614T4, be allocated to the Arizona Educational Agency for Surplus Property.

"Overt Act No. 6

"On or about July 25, 1950, the defendant C. W. Caywood did cause the Arizona Educational Agency for Surplus Property to receive from the United States Marine Corps, Barstow, California, one International Harvester Company TD–14 Tractor, Serial No. TDF6614T4.

"Overt Act No. 7

"On or about December 15, 1950, the defendant Harry Tompkins transferred, or caused to be transferred, to W. A. Thomasson, Jr., of Coolidge, Arizona, International Harvester Company TD–14 Tractor, Serial No. TDF6614T4, said transferee not being then and there legally entitled to receive said property as an educational institution.

"Overt Act No. 8

"On or about December 15, 1950, the defendants C. W. Caywood and Harry Tompkins did receive from Robert E. Johnson, Phoenix, Arizona, the sum of $6,878.55 in payment for International Harvester Company TD–14 Tractor, Serial No. TDF6614T4, personal property of the United States Government.

"Overt Act No. 9

"On or about June 28, 1950, the defendant C. W. Caywood filed, or caused to be filed with the appropriate agency of the United States Government, Form DP–2, requesting the allocation to the Arizona Educational Agency for Surplus Property of an International Harvester Company TD–14 Tractor, Serial No. TDF7012T4.

"Overt Act No. 10 .

"On or about July 25, 1950, the defendant C. W. Caywood did cause the Arizona Educational Agency for Surplus Property to receive from the United States Marine Corps, Barstow, California, one International Harvester Company TD–14 Tractor, Serial No. TDF7012T4.

"Overt Act No. 11

"On or about January 29, 1951,. the defendant Harry Tompkins transferred, or caused to be transferred, one International Harvester Company TD–14 Tractor,

Serial No. TDF7012T4, to Boyd McClintock, Phoenix, Arizona, said transferee not being then and there legally entitled to receive said property as an educational institution.

"Overt Act No. 12

"On or about January 30, 1951, the defendants C. W. Caywood and Harry Tompkins did receive from Boyd McClintock, Phoenix, Arizona, the sum of $9,059.86 in payment for one International Harvester Company TD–14 Tractor, Serial No. TDF7012T4.

"Overt Act No. 13

"On or about June 28, 1950, defendant C. W. Caywood filed, or caused to be filed, with the appropriate agency of the United States Government, Form DP–2, requesting the allocation to the Arizona Educational Agency for Surplus Property of an International Harvester Company TD–14 Tractor, Serial No. TDF7301T4.

"Overt Act No. 14

"On or about July 25, 1950, the defendant C. W. Caywood did cause the Arizona Educational Agency for Surplus Property to receive from the United States Marine Corps, Barstow, California, one International Harvester Company TD–14 Tractor, Serial No. TDF7301T4.

"Overt Act No. 15

"On or about February 15, 1951, the defendant Harry Tompkins transferred, or caused to be transferred, one International Harvester Company TD–14 Tractor, Serial No. TDF7301T4, to Boyd McClintock, Phoenix, Arizona, said transferee not being then and there legally entitled to receive said property as an educational institution.

"Overt Act No. 16

"On or about February 16, 1951, the defendants C. W. Caywood and Harry Tompkins did receive from Boyd McClintock, Phoenix, Arizona, the sum of $8,106.13 in payment for one International Harvester Company TD–14 Tractor, Serial No. TDF7301T4, property of the United States Government.

"Overt Act No. 17

"On or about November 1, 1949, defendant C. W. Caywood filed, or caused to be filed, with the appropriate agency of the United States Government, Form DP–2, requesting the allocation to the Arizona Educational Agency for Surplus Property of a Northwest Shovel, Serial No. 9906.

"Overt Act No. 18

"On or about December 20, 1949, the defendant C. W. Caywood did cause the Arizona Educational Agency for Surplus

vices, material facts" by making false writings in the execution of certain DP-

Property to receive from the United States Marine Corps, Camp Pendleton, California, at Oceanside, California, one Northwest Shovel, Serial No. 9906.

"Overt Act No. 19

"On or about May 26, 1950, the defendant Harry Tompkins, transferred, or caused to be transferred, one Northwest Shovel Serial No. 9906 to the City of Flagstaff, Arizona, a municipal corporation, said transferee not being then and there legally entitled to receive said property as an educational institution.

"Overt Act No. 20

"On or about November 30, 1950, the defendants C. W. Caywood and Harry Tompkins did receive from State Tractor and Equipment Co., an Arizona corporation, the sum of $1,175.61, in partial payment for one Northwest Shovel, Serial No. 9906.

"Overt Act No. 21

"On or about February 9, 1951, the defendants C. W. Caywood and Harry Tompkins did receive from State Tractor and Equipment Co., an Arizona corporation, the sum of $5,941.25, in partial payment for one Northwest Shovel, Serial No. 9906.

"Overt Act No. 22

"On or about November 1, 1949, the defendant C. W. Caywood, filed, or caused to be filed with the appropriate agency of the United States Government Form DP-2, requesting the allocation to the Arizona Educational Agency for Surplus

2 forms, and conspiracy to defraud the United States by depriving the United Property of a Northwest Shovel, Serial No. 10100.

"Overt Act No. 23

"On or about December 20, 1949, the defendant C. W. Caywood did cause the Arizona Educational Agency for Surplus Property to receive from the United States Marine Corps, Camp Pendleton, California, at Oceanside, California, one Northwest Shovel, Serial No. 10100.

"Overt Act No. 24

"On or about April 6, 1950, the defendant Harry Tompkins transferred, or caused to be transferred, one Northwest Shovel, Serial No. 10100 to San Xavier Rock and Sand Co., an Arizona corporation, said transferee not being then and there legally entitled to receive said property as an educational institution.

"Overt Act No. 25

"On or about April 7, 1950, the defendants C. W. Caywood and Harry Tompkins did receive from State Tractor and Equipment Co., an Arizona corporation, the sum of $6,500.00, in payment for one Northwest Shovel, Serial No. 10100.

"Overt Act No. 25

"On or about October 3, 1949, the defendant C. W. Caywood filed, or caused to be filed, with the appropriate agency of the United States Government, Form DP-2, requesting the allocation to the Arizona Educational Agency for Surplus Property of miscellaneous tractor parts, described on identification lists numbered as follows:

| List No. | Description of Property | Quantity |
| --- | --- | --- |
| 8418 | Spare Parts: Caterpiller Tractor Engine | 1 lot |
| 8417 | Spare Parts: Caterpiller Tractor Engine | 1 lot |
| 8403 | Spare Parts: Caterpiller Engine | 1 lot |
| 8402 | Spare Parts: Caterpiller Tractor | 1 lot |
| 8393 | Spare Parts: Caterpiller Tractor Engine | 1 lot |
| 8394 | Spare Parts: Caterpiller Engine | 1 lot |

"Overt Act No. 27

"On or about December 30, 1949, the defendant C. W. Caywood did cause the Arizona Educational Agency for Surplus Property to receive from the United States Marine Corps, Camp Barstow, California, miscellaneous tractor parts.

"Overt Act No. 28

"On or about February 18, 1950, the defendant Harry Tompkins, transferred, or caused to be transferred, miscellaneous tractor parts to State Tractor and Equipment Co., an Arizona corporation, said transferee not being then and there legally entitled to receive said property as an educational institution.

"Overt Act No. 29

"On or about February 18, 1950, the defendants C. W. Caywood and Harry Tompkins did receive from State Tractor and Equipment Co., an Arizona corporation, the sum of $3,000.00 in payment for miscellaneous tractor parts, personal property of the United States Government.

"Overt Act No. 30

"On or about June 30, 1951, the defendant Harry Tompkins transferred, or caused to be transferred, miscellaneous tractor parts to Robert Johnson, said transferee not being then and there legally entitled to receive said property as an educational institution.

"Overt Act No. 31

States of its right to have donable surplus property distributed to eligible institutions in violation of 40 U.S.C.A. § 484. The gravamen of the charge to defraud the United States under § 371 is found in the paragraph of the indictment reading as follows:

"That the defendants, conspired, confederated and agreed together to defraud the United States of America, and the agencies thereof, by de-

"On or about June 30, 1951, the defendants C. W. Caywood and Harry Tompkins did receive from Robert Johnson the sum of $1,075.00 in payment for miscellaneous tractor parts, personal property of the United States Government.
"Overt Act No. 32
"On or about April 10, 1951, the defendant Harry Tompkins transferred, or caused to be transferred, miscellaneous tractor parts to Robert Johnson, said transferee not being then and there legally entitled to receive said property as an educational institution.
"Overt Act No. 33
"On or about April 10, 1951, the defendants C. W. Caywood and Harry Tompkins did receive from Robert Johnson the sum of $40.67 in payment for miscellaneous tractor parts, personal property of the United States Government.
"Overt Act No. 34
"On or about April 4, 1951, the defendant Harry Tompkins, transferred, or caused to be transferred, miscellaneous tractor parts to Robert Johnson, said transferee not being then and there legally entitled to receive said property as an educational institution.
"Overt Act No. 35
"On or about April 4, 1951, the defendants C. W. Caywood and Harry Tompkins did receive from Robert Johnson, the sum of $564.18 in payment for miscellaneous tractor parts, personal property of the United States Government.
"Overt Act No. 36
"On or about June 15, 1950, the defendant C. W. Caywood filed, or caused to be filed with the appropriate agency of the United States Government, Form DP-2, requesting the allocation to the Arizona Educational Agency for Surplus Property of a Schramm 10 KW generating set, four vulcanizing molds, air bags, cabinets, two tire spreaders and miscellaneous assorted switch boxes.
"Overt Act No. 37
"On or about August 4, 1950, the defendant C. W. Caywood did cause the Arizona

priving said United States of its right, under the laws and regulations appertaining to the disposal of donable surplus property of the United States to have all such property disposed of according to the applicable laws and regulations and to defraud the United States by preventing it from distributing its surplus property to eligible educational institutions, and to defraud the

Educational Agency for Surplus Property to receive from the United States Marine Corps, Camp Pendleton, California, at Oceanside, California, one Schramm 10 KW generating set, four vulcanizing molds, air bags, cabinets, two tire spreaders and miscellaneous assorted switch boxes.
"Overt Act No. 38
"On or about April 5, 1951, the defendant Harry Tompkins transferred, or caused to be transferred, one Schramm 10 KW generating set, four vulcanizing molds, air bags, cabinets, two tire spreaders and miscellaneous assorted switch boxes, to The General Tire Company of Phoenix, Inc., an Arizona corporation, said transferee not being then and there legally entitled to receive said property as an educational institution.
"Overt Act No. 39
"On or about April 5, 1951, the defendants C. W. Caywood and Harry Tompkins did receive from The General Tire Company of Phoenix, Inc., an Arizona corporation, the sum of $1,000.00 in payment for one Schramm 10 KW generating set, four vulcanizing molds, air bags, cabinets, two tire spreaders and miscellaneous assorted switch boxes, personal property of the United States Government." (Emphasis supplied).
"Bill of Particulars
"* * *
"4. The specific items of surplus property of the United States obtained from the government of the Unitled States by means of said false statements on said forms DP-2 and DP-2, revised and diverted from distribution to tax-supported school systems, schools, colleges and universities and other nonprofit schools, colleges and universities exempt from taxation under section 101(6) of the internal revenue code [26 U.S.C.A. (I.R.C. 1939) § 101(6)], and converted to the use of the defendants and others not entitled thereto are the items of personal property described in the overt acts set forth in the indictment."

United States by diverting and converting its donable surplus property from eligible educational institutions for which allocated to the use of said defendants and others."

Caywood was also charged with embezzlement by separate indictment, but the court did not submit this charge to the jury. The bill of particulars carries forward the idea that evidence would be offered tending to show that there was a conspiracy to defraud the government by depriving the United States of the power to distribute its surplus property according to law and regulations.

The indictment alone and as defined by the bill of particulars charged and was clearly intended to charge a continuing conspiracy. The concert of action was contemplated as extending from the formulation of the unlawful agreement through the filing of the DP-2 forms, through the receipt of the specified items by Caywood, as Assistant Superintendent of Schools for the State of Arizona, and Tompkins, his co-conspirator, until the placement of each item thereof into the hands of a bona fide purchaser for value and without notice who was not authorized by Congress to receive such property. The transfer of any such item would deprive the United States of the right to have this property distributed to an eligible educational institution, in violation of 40 U.S.C.A. § 484, thereby defrauding the government in the manner charged.

A jury found Caywood and his confederate, Tompkins, guilty of the crime of conspiracy. Caywood alone appeals. Since all members of the Court agree he is guilty, the verdict should not be vacated unless for vital error of law.

Assignments of error as to the instructions given and refused and as to the indictment will first be noticed. None is well taken. The charge of the court sufficiently covered knowledge of the accused by requiring the jury to find the defendants "joined together in a mutual enterprise knowingly and criminally with the full understanding on the part of each other of what they were doing." It is complained that a specific intent was not proved and that the court refused an instruction that such intent was an essential. The excerpt above set out and the context of the whole charge sufficiently advised the jury that criminal intent was a necessary element. Ordinarily, intent will be inferred from the nature of the combination. Landen v. United States, 6 Cir., 299 F. 75. "Conspiring to defraud the United States is in itself 'inconsistent with an honest purpose.'" Razete v. United States, 6 Cir., 199 F.2d 44, 50.

It is objected that the substantive offenses were not defined by instruction. It is good practice to define specifically the substantive offenses, but here the essential elements thereof were adequately covered by the instruction as a whole. The next assignment was the giving by the court of an instruction which included the phrase "any improper interference with the United States Government in the discharge of its activities is deemed a fraud on the government." The balance of the instruction made it entirely clear that the court was charging that, if the defendants conspired to prevent the government from distributing this surplus property to eligible educational institutions by diverting it therefrom into the hands of persons unauthorized to receive it, a criminal agreement was charged, irrespective of the fact that the government was not thereby deprived of any property or property right.[2]

2. "Now I speak of conspiracy as defrauding the Government. That is the statute under which this indictment is brought. Here is what that means:
   "Any improper interference with the United States Government in the discharge of its activities is deemed to be a fraud on the Government. In other words, here the United States by statute was trying to do something for the Arizona schools and officials were trying to carry out their sworn duty to effectuate the object of the statutes. But that their functioning under that statute was interfered with improperly by Defendant Caywood and collaborated in by the other Defendant. In that they were not able to carry out that function, that is the scheme or fraud on the Government."

While then defendant Caywood was convicted by a jury after a fair and impartial trial presided over by a competent judge, it is now contended the conviction should be reversed, because the Statute of Limitations had run against the charge. We hold: (1) The indictment stated a crime of conspiracy with several overt acts alleged to have occurred within the period of three years before the finding thereof. (2) The conspiracy and these specified overt acts were proved by overwhelming evidence. (3) The defendant Caywood, after a prima facie case of continuing conspiracy had been proved, did not accept the burden of going forward with evidence to show that he took affirmative steps to cease cooperation or to show that the overt acts charged and proven had no connection therewith. He requested no instructions as to the continuance of the conspiracy and none as to the running of time.

The proof was conclusive that the object of the conspirators was to transfer illegally this property to unauthorized persons in order to obtain the proceeds and prevent distribution according to law in fraud of the government. The overwhelming evidence established the existence of continuous criminal concert of action by Caywood and Tompkins from the time of illegal agreement until each of the transfers charged in the indictment and proved by the evidence had been made. It was clearly shown that each of these transfers, alleged as overt acts, was made to an innocent person for value in violation of 40 U.S.C.A. § 484 and was in fraud of the government. The evidence of a continuing conspiracy up to consummation of the last of these illegal transfers was therefore uncontroverted.

Furthermore, the evidence showed no substantive crime of any kind had been committed until completion of the first transfer of an item of this property to an unauthorized innocent purchaser for value. It was proved and the jury found that the DP–2 forms were executed by Caywood, as Assistant Superintendent of Schools of the State of Arizona, who alone had the right to execute them by virtue of his official position. It was shown that the property was received in Arizona and came into possession of the State of Arizona and Caywood, as its agent. Caywood, it was proved and found by the jury, had possession of all of this property as a perquisite of his official position. It is true the record shows Tompkins had these items at his ranch. But his custody for Caywood would not have prevented the United States from compelling distribution to eligible educational institutions. The record establishes that the DP–2 forms were on their face true when filed. They were not false until an illegal transfer was made. The representations of Caywood therein that the items of property would be conveyed according to law were promissory in nature. Only when a conveyance was effectuated to an unqualified person by the conspirators was the substantive crime defined by 18 U.S.C.A. § 1001 committed. Although the filing was not illegal when done, that act could be used as an overt act in an indictment, but it could never be proved to be "in pursuance of the criminal design" until shown false by the unauthorized transfer. The acts of the conspirators up to the time of an illegal conveyance were on their face perfectly legal. The unlawful agreement contemplated the commission of crime by transfer, but no one can be convicted of a criminal design without more.

If Caywood had then carried out the provisons of law and the regulations and representations contained in the DP–2 forms, even if the property were at the time on Tompkins' ranch, and had transferred the property to an eligible educational institution, there would have been no crime. But the jury found as charged that Caywood, acting with and through Tompkins, conveyed items of property of the State of Arizona to persons unauthorized by the Acts of Congress to receive them. The sales to unauthorized persons were acts which consummated an unlawful and criminal agreement. Then, for the first time, the United

States was defrauded, not of its property, but of the right to have that property disposed of according to the statute passed by the Congress. These transfers, proved by uncontradicted evidence, prevented the United States from having this property, then in the hands of innocent purchasers for value, distributed to eligible educational institutions according to law.

When, and only when, these events frustrated the lawful power of the government to compel proper distribution was the charged conspiracy complete. The federal government could have intervened and compelled proper distribution of the property up until the time that each specific item got into the hands of an innocent purchaser for value.[3] Until frustration of the governmental purpose was complete by such sales, the conspiracy as charged and proved was still continuing. Until the transfers, the government of the United States was not yet irreparably defrauded. Therefore, the other alleged overt acts were charged only as preliminaries leading to the final act. The conspiracy was a unified crime, continuing until the last conveyance to an unauthorized person in violation of 40 U.S.C.A. § 484. Only then was the illicit scheme, clearly charged and overwhelmingly proved, complete.

The trial court submitted the case to the jury upon the theory that the object of the conspiracy was that, by these transfers to innocent purchasers for value, the United States would be prevented from having this property, which had been given to the State of Arizona for that purpose, placed in the hands of eligible educational institutions according to law. The trial court definitely charged the jury that any improper interference in the discharge of governmental activities was a fraud upon the government. The instructions of the trial court follow closely the text of Haas v. Henkel, 216 U.S. 462, 479, 30 S.Ct. 249, 54 L.Ed. 569. Thereby was negatived the idea that the charge of defrauding the government was based upon a deprivation of the title to the items of property.

But the trial court may well have been following our own opinion in Meyer v. United States, 9 Cir., 220 F. 800. In that case, the exact point as to the running of the Statute of Limitations was squarely raised. There the older cases in the Supreme Court, cited by defendant here, were followed, namely, United States v. Kissel, 218 U.S. 601, 31 S.Ct. 124, 54 L. Ed. 1168, and Brown v. Elliott, 225 U.S. 392, 32 S.Ct. 812, 56 L.Ed. 1136. The opinion carefully distinguishes cases relied upon by defendant, United States v. Irvine, 98 U.S. 450, 25 L.Ed. 193, and Lonabaugh v. United States, 8 Cir., 179 F. 476.[4] The distinction is based ex-

---

3. Upon the question of passage of title, we take no position. The conspiracy may have envisaged the passing of title. If title passed, it was obtained by fraud, and the United States could either recover it or compel proper distribution up until the time it passed to a bona fide purchaser for value without notice.

4. United States v. Irvine, 98 U.S. 450, 25 L.Ed. 193.
   The charge "in the indictment in this case, that * * * he [defendant] wrongfully withheld from her the amount of her pension" is not for conspiracy, but for substantive crime.
   Lonabaugh v. United States, 8 Cir., 179 F. 476, 477.
   The crime charged was a conspiracy "to defraud the United States of the possession and title of certain of its public lands." "Passing the question of their

appropriate allegation", the court held that the overt acts of physical receipt of land patent documents and conveyance of the land to a corporation, which were the only overt acts proved within the three years prior to the indictment, were not directed to the "attainment of one of the objects specified." This necessarily followed because of the holding of the court that title and the right to possession had been acquired by the conspirators prior to those acts. Since the object of the conspiracy charged, i.e., to get possession and title of the land, was narrow, the range of overt acts in pursuance thereof was also narrow.
   These later cases are also distinguishable:
   Fiswick v. United States, 329 U.S. 211, 67 S.Ct. 224, 226, 91 L.Ed. 196.

pressly upon the exact charge of the indictments involved in those cases and the conspiracies shown by the evidence therein. The only possible distinction between the Meyer case, supra, and the one at bar is that in the instant case the indictment charges a conspiracy, not to deprive the United States of property, but to deprive it of the right to have property which it once owned transferred to eligible educational institutions as above pointed out. The conspiracy in the Meyer case was [220 F. 804] " 'to defraud the United States of divers large sums of money by means of a certain fraudulent scheme.' " The argument was there made that, because the bulk of the illegal action, consisting of rigging of bidding at an exorbitant price for zinc and the issuance of a Navy paymaster's check for the inflated price, happened before May 31, 1908, an indictment dated May 31, 1911, was barred by the Statute of Limitations. The same indictment charged the endorsement of the check by one conspirator to the other and the deposit of the check to the private account of the second conspirator occurring on June 1, 1908. These activities were argued to be "mere private arrangement between them by way of settlement, and was not potent in any way in effectuating the object * * * of the alleged conspiracy." The government official had issued the check on May 26, 1908, and this was said to constitute payment by the United States and to conclude the conspiracy. In denying this contention, the court say:

"In contemplation of section 5440, R.S., a conspiracy may be entered into 'to defraud the United States in any manner or for any purpose.' The indictment is drawn under this clause. That a conspiracy attended with appropriate acts and conditions may consist of a continuing offense has been settled by adjudication of the Supreme Court. * * * It would seem, therefore, that so long as it may be shown that the conspirators are acting together for the common purpose comprehended by the scheme formed and entered upon with a view to defraud the government, and have, while so acting together, committed some overt act to effectuate the purpose, all within three years prior to the finding of the indictment, the statute has not run. * * * Our firm conviction is that public funds are not appropriated or converted while there is opportunity on the part of the government to prevent such appropriation, and in this case it was still within the power of the government to stop payment of this check, at least until credit was given for it by the bank of deposit * * * the acts of * * * negotiating this check and securing its payment

The "indictment charges that petitioners continuously between September 1, 1939, and the date the indictment was returned, September 13, 1944, conspired with each other * * * to defraud the United States by concealing and misrepresenting their membership in the Nazi party." It should be noted that the "last overt act alleged to have been committed by any of petitioners was the filing by Mayer of his registration statement on December 23, 1940." This resulted, of course, in that indictment containing no alleged overt act whatsoever falling within three years of the indictment. Moreover, this case did not involve the Statute of Limitations. Lutwak v. United States, 344 U.S. 604, 73 S.Ct. 481, 483, 97 L.Ed. 593. Here there was a "conspiracy 'to defraud the United States of and concerning its governmental function and right of administering' the immigration laws * * by obtaining the illegal entry into this country of three aliens as spouses of honorably discharged veterans." The last of the aliens was shown to have been admitted on December 5, 1947. " * * * there is no statement in the indictment of a single overt act of concealment that was committed after December 5, 1947, and no substantial evidence of any. Such acts as were set forth and proved were acts that revealed and did not conceal the fraud." Moreover, there was no "evidence that the conspiracy included the further agreement to conceal." This case involved no question of the Statute of Limitations, and the conviction reviewed herein was affirmed.

by the government were acts not merely of private arrangement * * * but designed and calculated to effect the object * * * of the scheme * * *."

This decision stands with its authority unshaken. We should not repudiate and disown it now. The trial courts should be able to rely upon what we have said in the past.

Besides, the matter of the Statute of Limitations was never called to the attention of the trial court during the trial in relation to the evidence or instructions. There were motions for acquittal at the close of the government's case and at the end of all of the evidence. We have the benefit of the arguments on these motions in the transcript. Neither the question of time of bringing the action nor the running of the statute is even given passing mention therein. Caywood did not ask the trial judge to give any instructions which would submit the fact questions as to the lapse of time to the trial jury. There was no objection or exception to the instructions of the trial court as to the overt acts or the completion of the conspiracy. Neither was an omission in instructions in this regard called to the attention of the trial court nor exception thereto asked for or allowed.

A defense of the running of the Statute of Limitations is properly submitted to the jury as a question of fact in a conspiracy case. The point could properly have been raised by Caywood. If he had presented evidence that he had ceased adherence to the conspiracy before the critical date, the issues of fact would have been clear-cut. There is a remote possibility that evidence could have been offered that the property passed to Tompkins upon delivery at his farm and that Caywood had no further interest therein. In any event, if such evidence had been tendered, the determination of the matter of the running of the statute must have been left to the jury. Caywood could have requested instructions as to how long the concert of action continued, whether the acts of unauthorized conveyance were done within three years prior to the finding of the indictment and whether they were done in pursuance of the conspiracy and with intent to consummate the criminal design. No such measures were taken. No pertinent objection or exception appears in the record of the trial. Furthermore, no error in this regard is specified in the statement of points on appeal, as required by the rules of this Court. Since this action was not taken, this Court should not dignify the afterthought as plain error unexcepted to. The foregoing discussion has proved there was no exception and demonstrated there was no error at the trial.

The claim as to the Statute of Limitations was raised only upon the motion to dismiss the indictment. No great point was made even there of this defense. It is clearly recognized that, unless the Court can find that the indictment does not state facts sufficient to constitute a crime by alleging a conspiracy continuing to within three years of the filing of the indictment, there is no error. In other words, if reversed, the direction must be to dismiss the indictment.

The indictment as a pleading is impervious to attack. The motion to dismiss on this ground was properly denied. The active clause of the statute is "conspire" "to defraud the United States * * * in any manner or for any purpose." 18 U.S.C.A. § 371.

The indictment was found January 18, 1954. Following the example of the Meyer case, the pleader tied the charge of conspiracy to defraud to at least twelve overt acts, alleged as occurring within three years of the date of the finding of the indictment. These acts, which showed concert of action between Caywood and Tompkins, were illegal transfers to unauthorized persons and the sharing of the proceeds thereof taking place after January 18, 1951, to-wit: acts 11 and 12 on January 29, 1951; acts 15 and 16 on February 15 and 16, 1951; acts 34 and 35 on April 4, 1951; acts 38

and 39 on April 5, 1951; acts 32 and 33 on April 10, 1951; acts 30 and 31 on June 30, 1951.[5]

The fact that the draftsman of the indictment included as overt acts the various transfers of property to persons unauthorized to receive it and receipt by Caywood of a portion of the money indicates the charge of a continuing conspiracy to defraud the United States by placing this property beyond the reach of the educational institutions for the use of which such articles were designated by Congress. The inclusion of such overt acts not only extends the time during which the conspiracy is alleged to have continued, but characterizes the nature of the fraud which the pleader intended to delineate and the limits of the unlawful agreement which he meant to charge.[6]

It is perfectly clear that the conspiracy count stated facts sufficient to constitute an offense. The trial court dismissed the substantive counts and deleted one portion of the conspiracy charge, namely, the embezzlement of federal property, holding that, as a result of the acts of defendants, title to the property itself had passed out of the United States.[7] This left the continuing crime of conspiracy to subvert the purpose of Congress by the offense of filing false statements and to defraud the United States by deflecting the property from the uses intended by Congress.

The indictment was not duplicitous. There was only one crime charged. The charge was that of a single unified conspiracy to commit several different offenses against the United States and to defraud the United States.[8] Only one agreement, encompassing all of these purposes, was set up. Concert of action to accomplish the object of deflecting this property from the uses to which Congress had directed, transferring it to unauthorized persons and pocketing the money, was clearly charged. The amalgam of an unlawful agreement and concert of action to accomplish these diverse results were bound together in the charge of a unified conspiracy. The concert was charged as having continued through until the fraud was accomplished. And the fraud charged in this indictment was accomplished only by the conveyances to unauthorized persons which placed the property conveyed beyond the power of the government to compel its allocation to eligible educational institutions.

The vital mistake of defendant is the disregard of the plain language of the indictment, the nature of the fraud on the government charged, the express pleading of overt acts within the statutory time and the clear intent of the pleader A continuing conspiracy was expressly charged. It is admitted, impliedly if not expressly, that there was a continuing conspiracy. The proof showed that the concert of action between Caywood and Tompkins lasted until the last overt act alleged. In the face of an express charge in the indictment of defrauding by consummation of the illegal transfers, it seems the contention is that there was a continuing conspiracy from the filing of the first DP–2 form through the filing of the last, but no longer. However, it was charged that the gov-

---

5. See boldface portions of Footnote 1, supra.

6. " * * * such overt acts as are alleged may be looked to and be used as explanatory of the conspiracy portion of the indictment." United States v. Carter & Co., D.C., 56 F.Supp. 311, 314.

7. The holding of the trial court as to the passage of title is irrelevant to the independent issue of the purpose and duration of a conspiracy to defraud the government, and is therefore not passed upon.

8. See Nye & Nissen v. United States, 9 Cir., 168 F.2d 846, 850, where it is said: "A single conspiracy may embrace several related conspiracies. And the rule is settled that a single conspiracy may have as its object two or more wrongful acts, and that an indictment charging such a conspiracy is not duplicitous for that reason. Braverman v. United States, 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23." Affirmed, Nye & Nissen v. United States, 336 U.S. 613, 69 S.Ct. 766, 93 L. Ed. 919.

ernment was not defrauded until the transfers to unauthorized persons were consummated. It has been suggested that the conspiracy was complete when the items of property reached Tompkins' ranch. Here again, it must have continued at least from the time of the arrival of the first shipment until the arrival of the last shipment. The face of the indictment is incompatible with such a theory.

The function of this Court is to construe the indictment as written. The conclusions above are not consistent with the charge made. An agreement, express or implied, between two persons to do an unlawful act is indictable as a conspiracy. If one or both is charged with doing an overt act in furtherance of the agreement and to accomplish the unlawful result, the crime of conspiracy is made out.

The transfer of an item of this property and the sharing of the proceeds were unlawful acts. An agreement of Caywood and Tompkins to do these acts and thereby to defraud the United States of its right to have the property allocated according to the law was a criminal conspiracy. The transfer of one of these items by Tompkins "in furtherance of said conspiracy and to effectuate the objects thereof" would make the conspirators guilty. All this was charged in the indictment. All this was established by overwhelming proof.

The judgment of conviction is affirmed.

POPE, Circuit Judge (concurring specially).

I agree that the judgment should be affirmed but as I am not prepared to approve all of the reasons given for affirmance in the foregoing opinion, I wish to indicate separately my own views.

In meeting the contention that the prosecution was barred by the statute of limitations Judge Fee says: "Furthermore, the evidence showed no substantive crime of any kind had been committed until completion of the first transfer of an item of this property to an unauthorized innocent purchaser for value."

Elsewhere the same point is repeated in the suggestion that the United States was defrauded "for the first time" when the property came into the hands of a "bona fide purchaser for value without notice". The suggestion is that until that time the crime charged had not been completed because there had not yet been accomplished a "frustration of the governmental purpose."

I find myself unable to agree with that suggestion for I think that it could well be concluded from the evidence in this case that the offense charged had been completed and accomplished prior to the time when Caywood or Tompkins or either of them had sold the property to the purchasers. In any event I am sure that it was unnecessary for the Government to prove as a part of its case that any one who thus bought the property was a bona fide purchaser without notice.

The evidence shows that after the surplus property here involved was procured through the use of false DP-2 certificates, most of it was delivered to the Tompkins Ranch. It could be inferred that Tompkins and Caywood were using this ranch as a place of sale for the surplus Government property, and that the property was assembled there for that purpose. If this was so, then the fraudulent objective of the conspiracy had been accomplished for at that point the frustration of the governmental function had been completed.

Again I find difficulty in perceiving any special significance in the fact that the property reached the hands of a bona fide purchaser for value and without notice. The property here involved was not negotiable nor do we have a situation in which the transferor is possessed of a legal title which he might transfer free from certain equities. I would think that if the Government or the State of Arizona chose to recover any of this property it could readily do so whether the purchaser did or did not have notice. I find nothing in the charge to the jury to indicate that the case was submitted upon the theory that the objective of

# 232

the conspiracy was to make transfers to innocent purchasers for value or that such transfers were an essential part of the Government's case.

It seems to me that the main question here is when a conspiracy within the meaning of the Act and alleged in the indictment was completed and came to an end. As in the case of Lutwak v. United States, 344 U.S. 604, 73 S.Ct. 481, 489, 97 L.Ed. 593, we must inquire when, on this record, the conspiracy ended. In the Lutwak case, the court was dealing with the use of declarations of one conspirator sought to be used against a co-conspirator when made in furtherance of the conspiracy saying, "There can be no furtherance of a conspiracy that has ended." The court proceeded to inquire when that conspiracy which related to the War Brides had ended and concluded that it ended when the last of these parties was admitted to the United States. We deal here with a question involving the statute of limitations. That statute "runs from the last overt act *during the existence of the conspiracy.*" Fiswick v. United States, 329 U.S. 211, 216, 67 S.Ct. 224, 227, 91 L.Ed. 196. (Emphasis added.)

If I were finding the facts here, I would think that when the property was assembled on the Tompkins ranch the conspirators had accomplished their objective, and henceforth were holding it for their own purposes exclusively, and that the distribution to the Arizona School system had then been completely frustrated and the object of the conspiracy fully attained. But I also think that the arrival of the property at the ranch, and the holding of it there, was equivocal, in that it *might* have been kept there for later delivery to the State. Possession at the Tompkins ranch may conceivably have still been possession by Caywood. I think a jury could take this latter view.

If appellant desired to have this question of fact determined, as a basis for a

judgment based on the running of the statute of limitations, he should have requested the court to submit an appropriate instruction to the jury. As he did not do so, I think we cannot on this record say that the prosecution was barred.

There is a further reason why I think the judgment must be affirmed and that has to do with the item of property listed in overt acts numbers 15 and 16 which were acts on February 15 and 16, 1951. This property was an International Harvester TD–14 tractor which did not go to the Tompkins ranch but following the DP–2 application it was shipped to the Prisoner of War Camp at Florence, Arizona, and from there was hauled to the State Tractor and Equipment Company at Phoenix where it was repaired. It was then sold as alleged in overt acts Nos. 15–16. So far as this property was concerned I would think the proof clear that the conspiracy was still continuing and had assuredly not then come to an end at the time this sale was accomplished.

I agree that the judgment should be affirmed.

STEPHENS, Circuit Judge (dissenting).

The following opinion was prepared by me and submitted to my associates. After many conferences my associates joined in an opinion upholding the conviction, whereas I had concluded that the judgment should be reversed on the ground that the statute of limitations had run prior to the date of the indictment. I am unable to agree with my associates, and evidence my dissent by the filing of my proposed opinion in which only the concluding paragraph has been changed, together with the personal pronoun throughout the opinion where appropriate, and a short paragraph added to footnote 11, page 26.

Under the provisions of the Federal Property and Administrative Service Act of 1949,[1] the Administrator of Gen-

---

1. Title 40 U.S.C.A. § 471 et seq. Section 484 provides, in applicable part:

"§ 484. Disposal of surplus property—
\* \* \* \* \*

eral Services is authorized to transfer on a basis of need to state departments of education, such equipment or supplies under the control of any federal executive agency as shall have been determined to be surplus. In Arizona, distribution of such surplus property to the schools and institutions was carried out by the Arizona Educational Agency for Surplus Property.

Caywood was Assistant Superintendent of Public Information for Arizona. In this capacity he was authorized to sign requisitions for necessary surplus property. Requisitions were made on government DP–2 forms and required the donee to certify in part that it was a school, college, or university operated by the state, that the property donated would be used solely for educational purposes, and that the request was reasonable and proper in view of the use to be made of the property.

On January 18, 1954, Caywood and one Tompkins were indicted and charged with conspiracy[2] to violate Title 18 U.S. C.A. § 1001,[3] by making false writings in the execution of certain DP–2 forms, and conspiring to deprive the United States of its right to have donable surplus property distributed to eligible institutions in violation of Title 40 U.S. C.A. § 484.[4] Caywood was also charged with embezzlement but the court did not submit this charge to the jury. The evidence showed that Caywood had falsely requisitioned various items through the State Educational Agency for Surplus

"(j) (1) Under such regulations as he may prescribe, the Administrator is authorized in his discretion to donate for educational purposes or public health purposes, including research, in the States, Territories, and possessions without cost (except for costs of care and handling) such equipment, materials, books, or other supplies under the control of any executive agency as shall have been determined to be surplus property and which shall have been determined under paragraph (2) or paragraph (3) of this subsection to be usable and necessary for educational purposes or public health purposes, including research.

"(2) Determination whether such surplus property (except surplus property donated in conformity with paragraph (3) of this subsection) is usable and necessary for educational purposes or public health purposes, including research, shall be made by the Federal Security Administrator, who shall allocate such property on the basis of needs and utilization for transfer by the Administrator of General Services to tax-supported medical institutions, hospitals, clinics, health centers, school systems, schools, colleges, and universities * * * which have been held exempt from taxation under section 101(6) of Title 26, or to State departments of education or health for distribution to such tax-supported and nonprofit medical institutions * * * [etc.], and universities; except that in any State where another agency is designated by State law for such purpose such transfer shall be made to said agency for such distribution within the State." June 30, 1949, c. 288, Title II, § 203, 63 Stat. 385; Aug. 10, 1949, c. 412, § 12(a), 63 Stat. 591; Sept. 5, 1950, c. 849, § 4, 64 Stat. 579.

**2.** Title 18 U.S.C.A. § 371 provides:
"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.
"If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor." June 25, 1948, c. 645, 62 Stat. 701.

**3.** § 1001 of Title 18 U.S.C.A. reads as follows:
"Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both." June 25, 1948, c. 645, 62 Stat. 749.

**4.** See footnote 1, supra.

Property, knowing that these items would never be distributed to the appropriate institutions, but would be (and later were) appropriated by Tompkins, the other defendant, who sold them and shared the proceeds with Caywood. The Jury returned a verdict of guilty as charged, and the trial court sentenced Caywood to eighteen months in prison, and he appeals.

Conspiracy is a separate and distinct crime from the crime or crimes of its object.[5] The crime of conspiracy is complete upon the formation of a criminal agreement and the performance of at least one independent overt act done in furtherance of the unlawful design.[6]

The overt act done to effect the object of the conspiracy may also, although it need not, constitute the crime which is the object of the conspiracy,[7] but it cannot come subsequent to the completion of the substantive crime.[8]

It is uniformly held that the statute of limitations, unless suspended, runs from the last overt act during the existence of the conspiracy.[9] The conspiracy was complete, in our case, with the overt acts of Caywood in signing and delivering the DP–2 forms to the government of the United States. A total of eight forms were signed, the most recent on June 28, 1950. Title 18 U.S.C.A. § 3282 provides in applicable part:

"Except as otherwise. expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found * * * within three years next after such offense shall have been committed." June 25, 1948, c. 645, 62 Stat. 828.[10]

As I have stated above, the indictment under which appellant was convicted was not found until January 18, 1954, nearly four years after the appellant's last act performed in aid of the conspiracy. It is therefore apparent that the crime had been committed more than three years before the date of the indictment.

It must be remembered that appellant had not been convicted of a substantive (so-called) crime, and that there is but a single conspiracy charged, viz., a conspiracy to deprive the government of and to thwart the disposition of such government surplus property to eligible schools as provided by § 1001, Title 18 U.S.C.A. See Lonabaugh v. United States, 8 Cir., 1910, 179 F. 476. The indictment contains thirty-nine alleged acts as being overt, as to the crime charged.

To be overt, the act must of course relate to the accomplishment of the substantive crime intended but not yet accomplished nor the intent abandoned.

In our case, the purpose of the conspiracy was accomplished and in the nature of things an act performed after the accomplishment could not be *toward* its accomplishment or overt in nature, though it might be explanatory of an act which on its face was not overt but so explained was shown to be overt. Some

5. American Tobacco Co. v. United States, 1946, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575; Blumenthal v. United States, 9 Cir., 1946, 158 F.2d 883, rehearing denied, 9 Cir., 1947, 158 F.2d 762, certiorari granted 331 U.S. 799, 67 S.Ct. 1306, 91 L.Ed. 1824, affirmed 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154, rehearing denied 332 U.S. 856, 68 S.Ct. 385, 92 L.Ed. 425.

6. Weniger v. United States, 1931, 9 Cir., 47 F.2d 692.

7. United States v. Holte, 1915, 236 U.S. 140, 35 S.Ct. 271, 59 L.Ed. 504; Coates v. United States, 9 Cir., 1932, 59 F.2d 173; Heskett v. United States, 9 Cir., 1932, 58 F.2d 897, certiorari denied 287 U.S. 643, 53 S.Ct. 89, 77 L.Ed. 556.

8. Hall v. United States, 10 Cir., 1940, 109 F.2d 976, 984; United States v. McGee, D.C.Wyo.1952, 108 F.Supp. 909, and authorities at page 912.

9. Fiswick v. United States, 1946, 329 U.S. 211, 216, 67 S.Ct. 224, 91 L.Ed. 196; Brown v. Elliott, 1912, 225 U.S. 392, 401, 32 S.Ct. 812, 56 L.Ed. 1136; Lonabaugh v. United States, 8 Cir., 1910, 179 F. 476, 478.

10. Title 18 U.S.C.A. § 3282 was amended Sept. 1, 1954, c. 1214, § 10(a), 68 Stat. 1145, by extending the limitation of actions to five years. See § 10(b) of the Act, 18 U.S.C.A. § 3282 note, also.

of the alleged acts which were set out as overt were actually performed *toward* the accomplishment of the alleged conspiracy and were therefore a part of it, but all of such overt acts were performed more than three years prior to the date of the indictment, and therefore were not within the three-year period of the Statute of Limitations. See Fiswick v. United States, 1946, 329 U.S. 211, 217, 67 S.Ct. 224, 91 L.Ed. 196. There is no proof of any act done toward completing the conspiracy within the three year period of the Statute of Limitations. The other acts alleged as overt which were within the three-year period of the Statute of Limitations were acts committed after the termination of the conspiracy by its successful culmination and many months after the conspirators had deprived the government of its property. These acts referred to the sale of the illegally obtained property to private interests, and to the division of the proceeds between the conspirators. See United States v. Irvine, 1878, 98 U.S. 450, 452, 25 L.Ed. 193, quoted in footnote.[11]

The crime alleged was not a continuing one, that is, the conspiracy was not kept alive as to a plan to obtain other and additional property in the future illegally from the government. And there is no indication in the evidence upon which such a continuing conspiracy could have been based. Further, neither government counsel nor the trial court treated it as such. In fact, the court instructed the jury that:

"It is charged * * * that they joined together in a scheme to get *this* Federal surplus property over here to Arizona and make personal use of it. Instead of allowing it to pursue the correct proper course of being distributed to the Arizona schools and school districts, the school system of Arizona." [Emphasis added]

And the government counsel's opening statement to the jury at the trial was to the same effect, naming specific property. See our comment on United States v. Kissel and Harned, 1910, 218 U.S. 601, 31 S.Ct. 124, 54 L.Ed. 1168, and definition of "continuing crime" in footnote.[12]

11. In United States v. Irvine, 1878, 98 U.S. 450, 452, 25 L.Ed. 193, the government took the position that where defendant had refused to return certain monies, he could be charged with continuing to withhold them so as to toll the running of the statute of limitations until he returned them. The court, in denying this premise, stated:

"But whatever this may be which constitutes the criminal act of withholding, it is a thing which must be capable of proof to a jury, and which, when it once exists, renders the party liable to indictment.

"There is in this but one offense. When it is committed, the party is guilty and is subject to criminal prosecution, and from that time, also, the Statute of Limitations applicable to the offense begins to run.

" * * *

"He pleads the statute of two years, * * *; but the reply is, You received the money. You have continued to withhold it these twenty years; every year, every month, every day, was a withholding, within the meaning of the statute.

"We do not so construe the Act. Whenever the act or series of acts necessary to constitute a criminal withholding of the money have transpired, the crime is complete, and from that day the Statute of Limitations begins to run against the prosecution."

See, also, Fiswick v. United States, 1946, 329 U.S. 211, 67 S.Ct. 224, 91 L.Ed. 196; Lonabaugh v. United States, 8 Cir., 1910, 179 F. 476.

See Nash v. United States, 1913, 229 U.S. 373, at page 378, 33 S.Ct. 780, at page 782, 57 L.Ed. 1232, wherein it is said that the Sherman Act, like common-law conspiracy, " * * * does not make the doing of any act other than the act of conspiring a condition of liability." Cited in United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, at page 252, 60 S.Ct. 811, at page 858, 84 L.Ed. 1129.

12. Thus, in United States v. Kissel and Harned, 1910, 218 U.S. 601, 31 S.Ct. 124, 54 L.Ed. 1168, the conspiracy was in unlawful restraint of trade, viz., to acquire the majority stock in a competing corporation and cause it to cease operations. The court in holding the defense of statute of limitations to be of no avail, pointed out that such a conspiracy contemplates that the conspirators will remain

From all the evidence shown in our case, the conspiracy had been accomplished completely (that is, the conspiracy as distinguished from the substantive crime of illegally disposing of the property and collecting the money therefor) more than three years before the indictment was found.[13]

That is not to say that the conspirators (defendant Caywood here) did not go

---

in business and continue their combined efforts to drive the competitor out until they succeed. As a result, the conspiracy continues up to the time of abandonment or success.

In our case, the evidence does not show any intent or overt acts toward subsequently illegally getting other and additional government property, which would make the conspiracy a "continuing" one.

A "continuing crime" is defined by 22 C.J.S., Criminal Law, § 1, p. 52, as: "A * * * continuous, unlawful act or series of acts set on foot by a single impulse and operated by an unintermittent force, however long a time it may occupy; an offense which continues day by day; a breach of the criminal law, not terminated by a single act or fact, but subsisting for a definite period and intended to cover or apply to successive similar obligations or occurrences."

13. The court instructed the jury in the instant case:

"What the government claims in this case is that defendant Caywood joined in a scheme * * * to get the property on the pretense it was going to be used for these purposes and then * * * used it for * * * personal purposes." [Emphasis added]

And the court went on to explain that it was not the getting of the property for which defendant was being tried, but for the conspiracy to get it for the illegal purpose. And the court told the jury that:

"The trial is not about anything they [the defendants] did, it is about whether they had an agreement. That is what you are to consider. Did these people have an agreement between them? Did they make it up between them to agree, conspire to do these things? You have to bring into these cases proof of what was done, that follows the agreement, if there was such an agreement. That is not what you are trying, if they did do these things, but do those things convince you, all taken together, beyond a reasonable doubt, there was prior agreement to do them." [Emphasis added]

The jury, acting upon this exceedingly plain talk, of course found that the prior agreement was shown. But not one of the facts showed that the act which deprived the government of the title to its property illegally (and which established

the conspiracy) had been done within three years of the indictment or that the conspiracy to get the property, or additional property, had been a live or continuing conspiracy within the three years preceding the indictment.

Of course, as the judge also told the jury, if defendants had secured the property in trust for the illegal users and they sold it for personal gain, a crime other than the crime of conspiracy (for which the defendant was being tried) would have been committed. On this point the court told the jury:

"There was a charge in another indictment here that I have taken out of the case, that * * * these defendants embezzled this property you heard about here. That is a charge of a substantive act. That was based by the government on the theory the property still remained the property of the United States government here in Arizona. I don't take that view of it. It seemed to me the government ceased to be the owner of the property and so I dismissed the case as to that part but that would have been a substantive charge; they did something, embezzled the property; that is out of the case. The trial is not about anything they did, it is about whether they had an agreement. * * *." [Emphasis added]

To carry the "continuing conspiracy" as applied to our case, to its logical extreme, will demonstrate its inapplicability, for if the overt acts done toward the commission of the substantive crime (which the defendants conspired to do) and which acts were performed within the three-year period, were held to be in furtherance of the conspiracy and thus to make it a continuing conspiracy and therefore bring it within the three-year period, then it would be as logical to suppose that some years hence, say twenty years, an overt act again would be performed by defendant in furtherance of the conspiracy by, say, selling some of the illegally diverted property which has possibly not been sold by defendants at present. If that were true, the conspiracy would continue until every piece of property involved were finally sold by defendants, which might go on for years. See United States v. Irvine, 1878, 98 U.S. 450, 452, 25 L.Ed. 193, and my comment in footnote 11, supra.

ahead after they had established their conspiracy to commit the crime of illegal disposition of government property by certain overt acts, to perform other and subsequent overt acts toward the accomplishment of the substantive crime which they had *conspired* to commit. The conspiracy was established by said overt acts prior to and outside the three-year period of the Statute of Limitations. Some of the later and subsequent acts of defendant which were performed toward the consummation of the substantive crime of illegal disposition of government property, were within the statutory three-year period, but they do not indicate that the conspiracy was a "continuing" one in the sense I have hereinbefore defined "continuing" (see my footnote 12, supra). Had defendant's illegal conspiracy been discovered co-incident with its establishment and an indictment then brought, he could have been convicted of the crime of conspiracy. But the conspiracy was discovered after Caywood and his co-conspirator had performed overt acts which were evidentiary of the conspiracy, to-wit, the disposal of the property. The fact that these later and subsequent acts were within the three-year period of the Statute of Limitations does not bring the *conspiracy* within the statutory period.[13a]

Prior to the trial, a motion was made on behalf of defendant Caywood to dismiss the indictment on the ground that "[t]he indictment was not found within three (3) years next after the alleged offense was committed." Immediately upon close of the evidence for prosecution and defense, the jury was excused whereupon the following was stated in open court:

"Mr. Ironside: On behalf of Defendant Tompkins, I make and renew all of the previous motions that have heretofore been made that have not been granted on the same ground and for the same reasons stated. And again renew the motion for judgment of acquittal on the conspiracy count.

"The Court: The ruling will be the same as before.

"Mr. Clark: On behalf of Defendant Caywood, I renew all motions I have heretofore made that have not been granted on the grounds and for the reasons heretofore stated.

"The Court: The same ruling. * * *."

Generally, an appeal ground must be presented to the trial court so that it may correct any error. Since the Statute of Limitations in this case appears, as I see it, upon the face of the indictment itself to have run and the error could only be "corrected" by a dismissal of the indictment, it would appear that the trial court was advised of the situation at the most effective and proper time and that repeti-

[13a] However, the case was submitted to the jury in the face of these principles, as will be seen by the following quotation from the court's instructions to the jury, to-wit:

"The Court: * * * They have a lot of proof here that said certain acts were done, the signing of these DP-2's. If you find Defendant Caywood signed them or authorized them to be signed, that would be an overt act; **the unloading of the property out here off the flatcar, hauling it to Tompkins' ranch,** if you find that happened, that would be an overt act; **selling the property, dividing the money.** You have had proof along all those lines. It is for you to say whether you accept it. But if you do find any things of that nature were done that would satisfy the requirement of overt act in the case. There must be first the agreement to do this thing we talked about here so much, divert this property from the schools and school system here to their own personal use. First agreement, you have to find that existed beyond a reasonable doubt before you can return a verdict of guilty; second, some act by one or the other of the defendants to carry out the agreement; likewise find one or more acts of that sort were done beyond a reasonable doubt before returning a verdict of guilty." [Emphasis added]

The above overt acts which have been emphasized were those in furtherance of the substantive crime after the crime of conspiracy had already been completed.

tion would have been redundant and more in the nature of a criticism of the court's ruling, than useful. See Arkansas Bridge Co. v. Kelly-Atkinson Construction Co., 8 Cir., 1922, 282 F. 802, 804; Shepler v. Crucible Fuel Co., 3 Cir., 1944, 140 F.2d 371, 374, to the effect that the statute could be waived. But in our case the statute was affirmatively presented and was not waived. In Retzer v. Wood, 1883, 109 U.S. 185, 3 S.Ct. 164, 27 L.Ed. 900, a civil case, it was held that the general issue did not bring the statute before the court, saying: "It is well settled, that in the absence of a contrary rule, established by statute, a defendant who desires to avail himself of a statute of limitations as a defense, must raise the question either in pleading, or in trial, or *before judgment.*" [Emphasis added] Assuming this language to apply to a criminal case (I do not decide), the statute in our case was called to the attention of the court in a proper and timely motion. And in Upton v. McLaughlin, 1881, 105 U.S. 640–642, 26 L.Ed. 1197, the court expresses the opinion that the presentation of the statute is too late if not presented *"prior to judgment".* [Emphasis added] I would hold that the Statute of Limitations in our case was properly pleaded, and that the trial court erred in refusing to dismiss the indictment.

Since the prosecution of this crime is barred by the Statute of Limitations, it is not necessary to consider the other grounds urged by appellant. However, I have examined all grounds and briefly refer to and rule upon them.

Specifications of Error Nos. 2 and 3 cover the point that in a conspiracy case intent is an element and must be proved. While the giving of a specific instruction on intent would have been the better practice, I am of the opinion that the instruction, as a whole, well informed the jury as to the requirements.

Specification of Error No. 4 covers the claim that the statement in the instruction, "Any improper interference with the United States Government in the discharge of its activities is deemed to be a fraud on the Government", is fatal to the verdict and judgment. The quoted sentence alone is not an accurate statement of the law, but read in context with the complete instruction it cannot be held as error.

Specification of Error No. 5 covers the point that the substantive offense was never defined in the instruction. It would have been the better practice to have specifically defined the substantive offense, but its substance was adequately covered by the instruction as a whole. Morris v. United States, 9 Cir., 1946, 156 F.2d 525, 169 A.L.R. 305.

The judgment should be reversed and the case should be remanded with instructions to the district court to dismiss the indictment.