## BLUMENTHAL et al. v. UNITED STATES.
### No. 11232.

Circuit Court of Appeals, Ninth Circuit.
Dec. 16, 1946.

Rehearing Denied Feb. 28, 1947.
See 158 F.2d 762.

Morris Oppenheim, of San Francisco, Cal., for appellant Blumenthal.

George Olshausen, of San Francisco, Cal., for appellant Abel.

Arthur B. Dunne and Walter H. Duane, both of San Francisco, Cal., for appellant Goldsmith.

Samuel S. Weiss, in pro. per.

Leo R. Friedman, of San Francisco, Cal., for appellant Feigenbaum.

Frank J. Hennessy, U. S. Atty., and Reynold H. Colvin, Asst. U. S. Atty., both of San Francisco, Cal., for appellee.

Before DENMAN, HEALY, and BONE, Circuit Judges.

BONE, Circuit Judge.

Appellants appeal from a conviction before a jury upon an indictment charging them, in one count, with the crime of conspiring to violate the Emergency Price Control Act, 50 U.S.C.A.Appendix,

§ 901 et seq., and Regulations by wilfully selling whisky at over-ceiling prices. Omitting formalities, the indictment reads as follows:

"That Harry Blumenthal, Louis Abel, Lawrence B. Goldsmith, Samuel S. Weiss, and Albert Feigenbaum, (hereinafter called 'said defendants') at a time and place to said Grand Jurors unknown, did knowingly, wilfully, unlawfully, corruptly, and feloniously conspire, combine, confederate, arrange, and agree together and with divers other persons, whose names are to the Grand Jurors unknown, to commit offenses against the United States of America and the laws thereof, the offenses being to knowingly, wilfully and unlawfully sell at wholesale certain distilled spirits, to-wit, Old Mr. Boston Rocking Chair Whiskey, in excess of and higher than the maximum price established by law, said maximum price at wholesale then and there being not in excess of $25.27 per case of twelve bottles, each of said twelve bottles containing one-fifth of one gallon of said Old Mr. Boston Rocking Chair Whiskey, in violation of Section 902(a), 904(a), and 925(b) of Title 50 U.S.C.A.Appendix, and Office of Price Administration Regulations: Maximum Price Regulation 193 and Maximum Price Regulation 445.

"And the said Grand Jurors, upon their oaths aforesaid, do further charge and present: That in pursuance of, and in furtherance of, in execution of, and for the purpose of carrying out, and to effect the object and design and purposes of said conspiracy, combination, confederation, and agreement aforesaid, the hereinafter named defendants did, at the times hereinafter set forth, commit the following overt acts within the Southern Division of the Northern District of California and within the jurisdiction of this Court: [followed by a recital of alleged overt acts]."

Appellants assail this indictment on the ground that a conspiracy or agreement to violate a regulation of the Price Administration is specially punishable under the provisions of the Emergency Price Control Act itself as a misdemeanor and therefore cannot be punished as a felony under the general conspiracy statute. They argue that when Congress provided that it should be unlawful to *agree* to sell or deliver any commodity in violation of any regulation imposed by the Price Administrator, it thereby made a conspiracy to violate a price regulation *punishable specially and exclusively* as provided in Section 925(b) of the Price Control Act and, therefore, no prosecution would lie under the general conspiracy statute, Title 18 U.S.C.A. § 88. It is contended that it was the purpose of Congress to do away, in prosecutions under the Price Control Act, with the harsh rule that a conspiracy to commit a misdemeanor is a felony.

■ The contention lacks merit. The manifest purpose of Congress in enacting the Emergency Price Control Act was to compel compliance with price regulations authorized under the statute. As pointed out in Kraus & Bros. v. United States, 327 U.S. 614, 620, 621, 66 S.Ct. 705, criminal liability attaches to any one who wilfully sells commodities in violation of a regulation or order of the Price Administrator establishing maximum prices. Congress forbade and made punishable an *agreement* to violate the act, and from this appellants conclude that the conspiracy statute (Title 18 U.S.C.A. § 88) was impliedly repealed or superseded by Congress to the extent that it does not apply to conspiracies to violate the Emergency Price Control Act and regulations promulgated thereunder.

■ We do not agree with this contention. The conspiracy statute includes as a necessary element the commission of an overt act. There is no mention of the overt act in pursuance of the agreement alluded to in the Emergency Price Control Act and we conclude that there is a clear and striking distinction between the mere agreement punishable as a misdemeanor, and the agreement *plus* an overt act within the purview of the felony statute.

■ Prosecutions based upon indictments for conspiracies to violate the Emergency Price Control Act have been upheld in Newman v. United States, 9 Cir., 156 F.2d 8; Old Monastery Co. v. United

States, 4 Cir., 147 F.2d 905; United States v. Renken, D.C.S.C., 1944, 55 F.Supp. 1; United States v. Krupnick, D.C.N.J., 1943, 51 F.Supp. 982; United States v. Armour & Co. of Delaware, D.C.Mass., 1943, 50 F.Supp. 347. Furthermore, there has been a long and consistent recognition that the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses, and the power of Congress to separate the two and to affix to each a different penalty is well established. A conspiracy to commit a crime is a different offense from the crime that is the object of the conspiracy. See Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180; American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125. See also Old Monastery Co. v. United States, supra.

■ On principle and from these authorities, we hold that a conspiracy to violate the Emergency Price Control Act and regulations promulgated thereunder is indictable as a separate and distinct offense.

■ There was evidence in this case from which the jury could properly have inferred beyond a reasonable doubt:—That Goldsmith operated a wholesale liquor business in San Francisco, California known as the Francisco Distributing Company (hereafter called Francisco) and Weiss was his sales manager; that in December of 1943, two carloads of whisky (the whisky referred to in the indictment) were received and recorded as purchased by Francisco though exactly who owned the whisky was not established; that this whisky was cased in cases of twelve bottles, each bottle containing one-fifth gallon; that during the months of December of 1943 and January of 1944, and while this whisky was held by Francisco, Abel, Blumenthal and Feigenbaum personally made sales therefrom of cases of whisky at wholesale to various persons, such sales being in lots of from 25 to 200 cases; that when such sales were made, the facilities of Francisco were thereupon used by them for the purpose of clearing such sales through the books of Francisco with the knowledge and cooperation of Goldsmith and Weiss; that for this particular service Goldsmith and Weiss received two dollars per case which they divided between themselves; that upon the making of such sales by Abel, Blumenthal and Feigenbaum, the whisky was invoiced and billed to each of their customers by Francisco and delivery effected to these customers through Francisco; that such invoices were required by state law to be issued from a legitimate wholesale liquor firm so that their records, as purchasers of whisky, could be properly kept to comply with this law; that Abel, Blumenthal and Feigenbaum were not engaged in business as wholesale liquor dealers and none of them held a basic permit as a wholesaler of liquor; that, Abel, Blumenthal and Feigenbaum shared in a common access to the stock or "pool" of whisky so held by Francisco, and each of them was free to and did make sales therefrom to liquor vendors and the liquor so sold by them was thereafter delivered to their customers through Francisco; that in each of these sales the liquor was billed to customers of Abel, Blumenthal and Feigenbaum by Francisco at $24.50 per case, and checks for this amount were given to Francisco; that in each sale so made by Abel, Blumenthal and Feigenbaum, each of them demanded and received a side-money payment from the customer to whom they sold whisky, which side-money payment, when added to the ostensible sale price of $24.50 per case, brought the price to these customers of Abel, Blumenthal and Feigenbaum within the range $55-$65 per case; that when the checks to Francisco were cleared through its books and the side-money payments collected by Abel, Blumenthal and Feigenbaum, the whisky was delivered by Francisco to these purchasers; that under the Emergency Price Control Act and applicable regulations the authorized wholesale ceiling price on this whisky was $25.27 per case at the time these sales were made in the months of December of 1943 and January of 1944.

Appellants vigorously contend that while certain overt acts were shown by the evidence, which might have indicated isolated offenses by individual appellants and punishable as such under the Price Control ... the evidence was insufficient to show

a conspiracy on the part of appellants to commit such offenses. They argue that even though the evidence may have established to the satisfaction of the jury, beyond a reasonable doubt, the truth of the facts as outlined above, nevertheless this proof falls short of creating the necessary inference of guilt legally sufficient to link appellants together as conspirators who had agreed together on a common plan or purpose to do the things shown by the evidence and thereafter engaged in acts designed and intended to carry this plan into execution; that this evidence failed to show (except in some instances) that appellants were acquainted with one another; that it showed only an identity of *results* rather than an identity of *purpose* and the latter must be shown in order to establish the existence of a conspiracy; that while Abel, Blumenthal and Feigenbaum were all conducting the same kind of transaction, no connection was shown between them other than that Goldsmith was the central distributing point from which the whisky was procured; that the independent sales shown to have been made by Abel, Blumenthal and Feigenbaum (and by certain other unknown and unnamed salesmen whose transactions were made to appear in the evidence) present a situation identical to that presented in United States v. Kotteakus, 328 U. S. 750, 66 S.Ct. 1239, in that the evidence showed several distinct transactions participated in by separate and distinct parties, the only "nexus" among them being in the fact that Goldsmith participated in all.

We cannot agree with these contentions. If the jury was convinced beyond a reasonable doubt that the facts and circumstances revealed by the evidence were true, then the jury was justified in inferring that appellants were parties to a single agreement and conspiracy to commit the of-

fenses charged in the indictment and that the overt acts established in the evidence were done and performed by appellants to further and carry into execution the objects and purposes of this conspiracy.

■ It is true, as argued, that when one conspiracy is charged, proof showing only different and disconnected smaller ones will not sustain conviction, and proof of crime committed by one or more of the defendants, wholly apart from and without relation to others conspiring to do the thing forbidden, will not sustain conviction. But, as herein indicated, the jury in this case was not confronted with that sort of situation. Here the evidence tended to prove, not a multitude of isolated conspiracies but a single general conspiracy in which the accused cooperated toward the same common end.

■ Appellants contend that the lower court erred in admitting in evidence certain sales of whisky by Abel, Blumenthal and Feigenbaum to purchasers from them, without *first* having proved that appellants took part in a conspiracy, that is, *until* the corpus delicti was proved. But the corpus delicti itself may be shown to exist by overt acts such as an exchange of words, circumstances and events showing a course of dealings. Any or all of these may provide the basis from which the existence of the conspiracy might be inferred by the jury. Commission of the overt acts may constitute the best proof of the conspiracy and such evidence is often used for that purpose.[1]

■ An overt act need not be in itself a criminal act,[2] nor the very crime that is the object of the conspiracy. United States v. Rabinowich, 238 U.S. 78, 86, 35 S.Ct. 682, 59 L.Ed. 1211; Pierce v. United States, 252 U.S. 239, 244, 40 S.Ct. 205, 64 L.Ed. 542. It is sufficient that the

---

[1] Marino v. United States, 9 Cir., 91 F. 2d 691, 698, 113 A.L.R. 975, certiorari denied 302 U.S. 764, 58 S.Ct. 410, 82 L.Ed. 593; Stack v. United States, 9 Cir., 27 F.2d 16, 17; Fisher v. United States, 4 Cir., 2 F.2d 843, 846; Hoeppel v. United States, 66 App.D.C. 71, 85 F.2d 237, 242; Rose v. United States, 9 Cir., 149 F.2d 755, 759; American Tobacco Co. v. United States, 6 Cir., 147 F.2d 93,

107; Glasser v. United States, 315 U. S. 60, 62 S.Ct. 457, 86 L.Ed. 680; American Tobacco Co. v. United States, supra; McDonald v. United States, 77 U. S.App.D.C. 33, 133 F.2d 23.

[2] Rose v. United States, supra; United States v. Rabinowich, supra; Marino v. United States, supra (see note 10 in case).

overt act should accompany or follow the agreement and it must be done in furtherance of the object of it. See Marino v. United States, supra, notes 12 and 13 in reported case.

 In this case the Government relied on circumstantial evidence to show the existence of the conspiracy. The claimed offense is one which from its very nature can rarely be proved by direct evidence. Ordinarily only the results of a conspiracy, and not the private plottings, are observed. Like any other issue of fact conspiracy may be proved by circumstantial evidence. Rose v. United States, supra. To constitute an unlawful conspiracy no formal agreement is necessary. Lawlor v. Loewe, 235 U.S. 522, 35 S.Ct. 170, 59 L.Ed. 341; American Tobacco v. United States (Supreme Court, footnote 1). The crime is almost always a matter of inference deduced from the acts of the persons accused, which are done in pursuance of an apparent criminal purpose. Pearlman v. United States, 9 Cir., 20 F.2d 113, 114 (certiorari denied 275 U.S. 549, 48 S.Ct. 85, 72 L.Ed. 419); Oliver v. United States, 10 Cir., 121 F.2d 245, 249; American Tobacco v. United States, 6 Cir., 147 F.2d 93, 107. The proof need go no further than reach that degree of probability where the general experience of men suggests that it has passed the mark of reasonable doubt. Rose v. United States, supra.

Here the circumstances support the inference of a common design. The transaction was coherent, followed a consistent pattern, and extended over a relatively brief period of time. It involved quite simply the acquisition of a single large lot of whisky and its sale ostensibly at a uniform below-ceiling price per case to be paid by check, plus the exaction in cash of side-payments as heavy as the traffic would bear; hence the use of solicitors in what was peculiarly a seller's market. Each of the accused men appears as a cog in an enterprise bearing throughout the earmarks of a premeditated scheme in which each actor was to play his appointed role. Superficially all is made to appear regular while beneath the surface

the law is flouted to the profit of the participants. To say that there is no evidence of a conspiracy among the several actors is to deny the lessons of experience.

 Furthermore, the order in which evidence to prove the corpus delicti is to be received is largely a matter within the discretion of the trial court. The logical sequence of events—from agreement in a common purpose to perpetration of an act designed to carry it out—does not require that introduction of the evidence must follow the same rigorous sequence. As pointed out above, commission of an overt act may, in itself, constitute the best proof of the conspiracy. The rule in this circuit is clearly indicated in Stack v. United States, supra; Marino v. United States, supra; Rose v. United States, supra and Gros. v. United States, 9 Cir., 138 F.2d 261. See also Hoeppel v. United States, supra and McDonald v. United States, 77 U.S.App.D.C. 33, 133 F.2d 23.

 Appellants also contend that the lawful and proper wholesale ceiling price of the whisky was not established by the evidence. They challenge the application at the trial of Maximum Price Regulation 193, Order No. 5 thereunder, and Maximum Price Regulation 445 to determine the lawful wholesale ceiling price of $25.27 per case on the whisky sold by appellants, and they further contend that Maximum Price Regulation 445 has no application because it was not in effect at the time of the sales.

These contentions are without merit. We find that Maximum Price Regulation 445 was in effect during all of the period covered by the charge in the indictment. Further, that the formula prescribed and required to be applied under these regulations to determine the proper and lawful wholesale ceiling price of $25.27 per case was clearly expressed by the Price Administrator and the dividing line between unlawful evasion and lawful action was not left to conjecture. The lawful price can be clearly ascertained from the regulations and it was properly applied by the lower court in its instructions to the jury.

It is also urged by appellants that these regulations are void because their requirements are so vague, indefinite and uncertain that the wit of man is incapable of understanding them. We disagree. The challenged regulations are free of the claimed infirmities. It is significant that the records required to be kept on sales of whisky referred to in the indictment were made to show an invoiced wholesale price (not including the illegally collected "side-payments") of $24.50 per case. The adoption and use of this "wholesale price" on such sales records revealed a knowledge and understanding of the wholesale price requirements of the applicable regulations sufficient to present to the jury a clear inference that the studied purpose of the appellant-sellers was to make this invoice price come within the lawful wholesale ceiling price of $25.27 per case in order that such recorded sales would appear to conform to the price requirements of the very regulations and the order which appellants here characterize and denounce as being so vague and uncertain as to be incomprehensible.

Appellants also assert the invalidity of the regulations. The same argument was asserted in Old Monastery v. United States, supra. The same regulations were there involved and the court found no merit in the contention. The Yakus case (321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834) lays at rest the question of appellants' right to attack the validity of such regulations in this proceeding. There is an adequate separate procedure available for the adjudication of the validity of administrative regulations when questioned, even in criminal cases. The record shows no attempt by appellants to employ the procedure referred to in the Yakus case, and in view of the rule there laid down, we hold that appellants' challenge to the validity of the regulations and Order No. 5 cannot here be considered.

The contention that the evidence showed that appellants who sold the whisky were "finders" for the purchasers is without merit. The evidence clearly permitted a convincing inference to the contrary and it satisfied the jury, beyond a reasonable doubt, that where sales were established as having been made by Abel, Blumenthal and Feigenbaum to certain buyers from them, they were sellers in these transactions and not "buying agents" for these purchasers.

One Harkins, a special investigator for the Alcohol Tax Unit of the Treasury Department, testified concerning the details of an interview he had with Goldsmith and his sales manager, Weiss, during January of 1944. (Harkins appears to have had a later interview with these two appellants in September of 1944 regarding the same matter.) He had been checking on the sales of the whisky here involved. In these conversations, these appellants told Harkins of the receipt by them of the two carloads of whisky and stated to him that they had received a fee of $2 a case for clearing the whisky through the books of the Francisco.

Objection was made by appellants to the Harkins testimony on the ground that it was not binding on any of them except Goldsmith and Weiss; that the September interview was after the conclusion of the alleged conspiracy and was a narrative of past events; that it was hearsay, and that the corpus delicti had not been established. At the conclusion of the testimony, the court instructed the jury that the statements made by Goldsmith and Weiss to Harkins could only be considered as against Goldsmith and Weiss. The instruction was proper. Chevillard v. United States, 9 Cir., 155 F.2d 929.

Aside from the Harkins testimony directly affecting the activities of Goldsmith and Weiss, there was ample evidence of active participation in the conspiracy charged to sustain, beyond a reasonable doubt, an inference of guilt of Abel, Blumenthal and Feigenbaum, the other three appellants. This evidence also fully sustains the inference that the sales of whisky by Abel, Blumenthal and Feigenbaum were made by them and delivery to their customers accomplished by means of the cooperation and participation of Goldsmith and Weiss in this sales scheme. Such a conclusion is clearly supported by reasonable inferences to be drawn from the evidence.

■ Another contention is that since the court below admitted the testimony of each witness against only a particular defendant with whom he dealt, and awaited the motion of the Government at the close of its case to admit all of the testimony against all of the defendants[3] upon the ground that a conspiracy had been established among them, they were deprived of the right of cross-examination—this because they could not cross-examine at the time of such limited admission without waiving its limitation. They argue that this situation gave them no opporunity to cross-examine later in the trial and prior to the granting of the Government's motion. The record does not support them in this contention. Their objections at trial reveal no protest against a deprivation of the claimed right. No demand to cross-examine was made at the time of the granting of the Government's motion. See Levine v. United States, 9 Cir., 79 F.2d 364, 368.

■ An exception was noted by appellants to that portion of the charge to the jury which informed the jury that in every crime there must exist a union or joint operation of act and intent, and for conviction both elements must be proved to a moral certainty and beyond a reasonable doubt; that such intent is merely the purpose or willingness to commit such an act; that a person is presumed to intend to do all that which he voluntarily and wilfully does in fact do, and must also be presumed to intend all the natural, probable and usual consequences of all his acts.

We find nothing objectionable in this instruction. See United States v. General Motors, 7 Cir., 121 F.2d 376, at 402; Gates v. United States, 10 Cir., 122 F.2d 571, 575.

■ We have examined this record with care to assure ourselves that substantial rights of appellants (who did not testify) have not been invaded by the wrongful admission of evidence and by the instructions to the jury. The instructions adequately informed the jury concerning the weight to be given circum-

stantial evidence and the necessity of receiving with caution the testimony of an accomplice or co-conspirator; the quantum and character of proof necessary to establish the existence of a conspiracy; the element of reasonable doubt regarding the guilt of any one of the appellants, and the necessity of applying the rule of reasonable doubt to every material element of the events charged in the indictment. The rule of proof as to the establishment of the commission of overt acts was properly stated. From our examination we are satisfied that the instructions, taken as a whole, correctly presented the law to the jury.

The evidence admitted in this case supports the verdict. It convinced the jury beyond a reasonable doubt that appellants were active participants in a single conspiracy the purpose and result of which was the deliberate use of the black-market side-payment device to violate the Emergency Price Control Act.

Affirmed.

---

[3] This motion was granted except with respect to the testimony of Harkins which was admitted only against Goldsmith and Weiss.