**A. C. PARK, Petitioner-Appellant,**

v.

**H. T. (Tommy) HUFF,
Respondent-Appellee.**

**No. 73–1897.**

United States Court of Appeals,
Fifth Circuit.

Jan. 20, 1975.

850

King, Jr., Atlanta, Ga., for respondent-appellee.

Before BROWN, Chief Judge, and WISDOM, GEWIN, BELL, THORN-BERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, CLARK, RONEY and GEE, Circuit Judges.

COLEMAN, Circuit Judge.

Floyd Hoard was the Solicitor General (District Attorney) of the Piedmont Judicial Circuit of the State of Georgia. On the morning of August 7, 1967, by means of a dynamite bomb attached the previous night to the ignition system of his automobile, the Solicitor General was precipitately dispatched from this world. Among those soon indicted for murder in connection with this heinous occurrence was A. C. Park, the present habeas corpus appellant.

A jury in Jackson County convicted Park, with no recommendation for mercy. He was sentenced to death by electrocution. On appeal to the Supreme Court of Georgia, the conviction was reversed for the failure to have accorded Park the right to both open and close the jury arguments in compliance with certain provisions of a Georgia statute which had been in effect since 1852, Park v. State, 224 Ga. 467, 162 S.E.2d 359, 368 (1968).

At the second trial, Park was again convicted and the conviction was affirmed, Park v. State, 225 Ga. 618, 170 S.E.2d 687 (1969).

On petition for certiorari, the United States Supreme Court, without reaching the merits, vacated the death penalty and remanded the case to the Supreme Court of Georgia for further proceedings, Park v. Georgia, 408 U.S. 935, 92 S.Ct. 2845, 33 L.Ed.2d 749 (1972). This resulted in a life sentence, Park v. State of Georgia, 229 Ga. 731, 194 S.E.2d 410 (1972).

Wesley R. Asinof, Fayetteville, Ga., for petitioner-appellant.

Tony H. Hight, Dist. Atty. Assoc., Arthur K. Bolton, Atty. Gen., Atlanta, Ga., Nat Hancock, Jefferson, Ga., David L. G.

This did not end matters. Park next instituted habeas corpus proceedings, attacking the constitutional validity of his conviction. In an extensive written opinion (which does not appear to have been reported in Federal Supplement), the District Court for the Northern District of Georgia denied relief, (1973).

On appeal to this Court, that judgment was reversed, one Judge dissenting, Park v. Huff, 493 F.2d 923 (1974).

The case was subsequently ordered reheard en banc, with oral argument, 493 F.2d 935 (1974).

Upon such rehearing, we are convinced that Park's conviction involved no collision with the Confrontation Clause of the Sixth Amendment. We affirm the judgment of the District Court.

Four men were indicted along with Park.

J. H. Blackwell had connected the bomb to the automobile ignition. With full knowledge of the scheme, Lloyd G. Seay and George Ira Worley had assisted in obtaining the dynamite at a store in Anderson, South Carolina. They were lurking near the Hoard residence on the Sunday night when the deadly deed was done, having gone there in the same automobile with Blackwell.

Douglas Pinion initiated the $5,500 contract for the killing and later paid the fee to Seay, but he did not go to the murder scene.

At the time of Park's second conviction, Pinion, Blackwell, Seay, and Worley were all serving life sentences for the murder. Seay and Blackwell pleaded guilty upon a recommendation for life sentences. Juries convicted Pinion and Worley, see Pinion v. State, 225 Ga. 36, 165 S.E.2d 708; also unreported opinion of District Judge Sidney O. Smith, Jr. (App. 395).

The extensive trial and appellate records compiled prior to the filing of the petition for habeas corpus raise no substantial dispute as to the roles respectively played by Blackwell, Seay, Worley, and Pinion in the paid assassination.

The legal battle, the one we are concerned with here, has been, and is, over the conspiratorial part allegedly played by Park, of which he stands convicted and from which he seeks escape by the federal habeas corpus door.

On Park's second appeal, the Supreme Court of Georgia held that the evidence at the second trial "was at least as strong as on the first trial and amply authorized the verdict", 170 S.E.2d at 691.

## FACTS RECITED BY THE GEORGIA SUPREME COURT

Our reading of the record prompts us to adopt, as amply supported by the record, the recitation of the evidence recited by the Georgia Supreme Court in its opinion disposing of the first appeal, 162 S.E.2d 361–363:

"About the latter part of March 1967, Solicitor General Hoard was concerned about the illegal sale of alcoholic beverages being made from a garage at the residence of the defendant Park and also from a building owned by him and known as 'the yellow house,' both located in Jackson County, where the sale of alcoholic beverages was not legal. There was evidence that since 1965 Park and the co-indictee Pinion had worked together in such sales. In late March Hoard began an investigation of these sales. This investigation was begun without telling local sheriff Perry, but later Hoard apparently informed him.

"Hoard obtained the assistance of an agent of the Georgia Bureau of Investigation, and in turn other law enforcement personnel were brought in. Several of these men made purchases at the above named places in order to obtain evidence for a contemplated padlock proceeding. One testified that 'this was an open operation and there—nothing hidden about the thing. You just walked in there and asked him for some liquor and he sold it to you and it was more or less generally known it was carried on that way.'

"A raid was scheduled for Saturday afternoon, May 6, 1967. However, on Friday evening it was discovered that Park was attempting to move large quantities of alcohol from these two places. Thereupon, the scheduled raid was immediately made and $21,700 of contraband, consisting of 31 cases of whiskey and 2,254 cases of beer, was taken. Park and Albert Funderburk, who had been employed at 'the yellow house' by Park for almost two years, were arrested. Criminal cases were made against the two men by Hoard.

"On May 23, 1967, upon Hoard's petition, an order was issued directing that the two places be padlocked.

"On July 11, 1967, Park, Funderburk and another employee of Park entered pleas of guilty for such illegal alcohol operations, and their fines, totaling $6,300, were paid by Park. Also, on this date, an appeal from the padlock order was dismissed. About this time Funderburk made plans to move back into the yellow house in August.

"Neither this padlock order nor the confiscation order on the alcohol seized was carried out until after the death of Hoard. There is no evidence as to why these orders were not executed.

.        .        .        .        .

"Next, we recite the salient testimony of events immediately surrounding the murder.

"This testimony was given by the coindictee Blackwell, to whom the State had offered to recommend a life sentence provided he would testify fully, fairly and completely, and also by the co-indictee Seay. No mention of any such offer to Seay appears.

### [BLACKWELL'S TESTIMONY]

"Blackwell's testimony, insofar as material on these issues, was that which follows.

"Prior to Solicitor General Hoard's death Seay asked Blackwell if he had the nerve to kill anybody and two weeks later inquired of him if he would 'blow that man up,' without identifying anyone. No affirmative answer appears to have been given.

"On Thursday before Hoard's death on Monday, August 7, 1967, Seay, Blackwell, and another co-indictee, Worley, met by pre-arrangement at a named highway restaurant in another county and drove to Anderson, South Carolina, where Blackwell, with money provided by the others of that group, purchased sticks of dynamite and caps. On Saturday Seay showed Blackwell how to connect these to the coil of an automobile.

"On Sunday evening Blackwell, Seay and Worley met. Seay offered Blackwell $1,500 if he would go with them and watch while Seay or Worley put the dynamite on the car. One of them, Seay he thought, told Blackwell 'the man wanted it done that night before he went to court on Monday.' Worley pointed out Hoard's house, and Seay made a short trip to verify it and the car parked there as Hoard's. During this time Blackwell and Worley went to a nearby place, wired several sticks of dynamite together, and returned to a point near Hoard's residence.

"Then Blackwell went to Hoard's yard where his car was parked, placed the dynamite and one cap to the coil of the car, and rejoined Seay and Worley. The three drove away, and at a bridge the shoes and gloves Blackwell had worn were thrown out.

"Later on the same night Blackwell went to Wrightsville, Georgia, and during the morning heard of Hoard's death over the radio.

"On the following Wednesday, Seay gave Blackwell $700 in cash and an automobile valued at $800.

"Blackwell identified certain photographs, including places and objects associated with the murder.

### [SEAY'S TESTIMONY]

"The testimony of the co-indictee Seay, insofar as material here, was that which follows.

"He had known Blackwell about eight months, Worley four or five

years, and Pinion some six to eight years. He was 23 years of age and had known Park since childhood.

"He had not had any direct dealings with Park.

"In June, about two months before Hoard's death, Pinion asked Seay if he wanted to make some 'easy money,' and later told him that 'he wanted a man done away with,' saying it was Hoard. He did not say who wanted it done, but mentioned to him 'the old man' several times.

"Pinion had told Seay on a number of occasions that he was working with Park, and Seay once talked with both of them about their buying liquor from him. They talked about payment and arrangements in connection with this, and one of them told him that whenever he needed money he could come to Park's place and pick it up, but Seay did not recall ever doing so.

"This dealing with Park and Pinion began three or four years previously and continued until Hoard was killed. Pinion was the only person he dealt with on behalf of Park. When he had the conversation with Pinion about doing away with Hoard, he knew that Pinion was acting on behalf of Park, and in their conversations Pinion and he always referred to Park as 'the old man.'

"Pinion did not tell Seay that 'the old man' wanted Hoard done away with, but that 'a man wanted somebody done away with.' Also, he did not say why he wanted Hoard killed. He mentioned to Seay the liquor raid made by Hoard, but Seay did not recall whether this was at the same time he discussed killing Hoard.

"Pinion first offered Seay $5,000, and said it would be best to kill Hoard on the road with a shotgun as he was returning home.

"Seay told Pinion that he was not interested but would try to find someone. Seay mentioned it to Worley, who wanted $7,500. Worley did not know whom Seay had in mind to be killed. Pinion said that Hoard had to be killed before he went to court that Monday morning, and Seay so told Worley. Seay then reported to Pinion that he had someone to do it if he would pay more money. Pinion replied 'Well, that is all the man will pay,' and 'I don't think the man will pay any more. I will go see. I will check.' Pinion left and in about 45 minutes he returned and told Seay, 'the old man won't go up any more. I will put $500 on it. Make it $5,500.' Worley did not wish to do it but decided to go ahead.

"On either Thursday or Friday, Seay, Blackwell, and Worley arranged their meeting at a highway restaurant, made the trip to South Carolina, purchased the explosives, returned to Jackson County, and Blackwell experimented with wiring the caps to a 1964 Ford automobile.

"Seay told Worley that he did not want to be involved, but Worley replied that if he didn't, 'the old man' would get someone else and intimated that 'the old man' would harm him or his family. Seay knew whom Worley was referring to, and stated that 'we always referred to "the old man" as Mr. Park.'

"Seay then testified essentially the same as Blackwell with reference to what transpired later, including the meeting on Sunday night of him, Blackwell and Worley, their proceeding to and locating Hoard's residence and car, tying the explosives, Blackwell's rigging them to the automobile, disposing of the shoes and gloves, going to Wrightsville, learning of Hoard's death, and returning to Pickens County. Seay also identified the same photographs that Blackwell had verified.

"Five or six days after Hoard's death Pinion brought $5,500 in cash to Seay, and Seay gave the money to Worley who divided it $2,000 to Seay, $2,000 to Worley and $1,500 to Blackwell. Pinion told Seay that 'the old

man' was worried and had asked who did it, and that he had told him others did it.

"There was testimony by other witnesses for the State, which verified some of the foregoing, particularly the physical facts, but it is not necessary to recite it here.

"In his unsworn statement Park disavowed any participation whatever in the murder of Hoard."

Our panel opinion in this case stated, "The out-of-court statements of Pinion and Worley, however, clearly implied that Park was involved in the conspiracy to murder Solicitor General Hoard", 493 F.2d at 927. The panel opinion also noted the existence of "testimony that Pinion acted as Park's 'enforcer' and that he used guns and administered beatings in the prosecution of their illicit business". In other words, when Pinion went to see "the old man" about raising the fee for the assassination, the deduction that Pinion was acting for and on behalf of Park rested on far more than fanciful grounds.

After its recitation of the facts in evidence, the Supreme Court of Georgia applied the law as follows, 162 S.E.2d 364, 365:

"Since this defendant did not commit the act itself and was not actually present at the scene when others committed it, in order for him to be convicted the evidence must connect him with the crime upon the theory of conspiracy, which is 'a corrupt agreement between two or more persons to do an unlawful act.' Fincher v. State, 211 Ga. 89(4), 84 S.E.2d 76.

"Proof of conspiracy is required for the admission of the testimony of Seay as to declarations allegedly made to him by Pinion and as to statements allegedly made to him by Worley.

"Our Code, § 38–306, provides that 'After the fact of conspiracy shall be proved, the declarations by any one of the conspirators during the pendency of the criminal project shall be admissible against all.' This court, in applying this section, has held that the con-

spiracy itself must be proved by evidence aliunde such declarations, and that the declarations are not admissible unless the conspiracy is prima facie shown by such aliunde evidence. Lanier v. State, 187 Ga. 534(4), 542–543, 1 S.E.2d 405, and citations.

"The existence of a conspiracy 'may be established by direct proof, or by inference, as a deduction from acts and conduct, which discloses a common design on their part to act together for the accomplishment of the unlawful purpose. In other words, the existence of the common design or purpose between two or more persons to commit an unlawful act may be shown by either direct or circumstantial evidence.' Chappell v. State, 209 Ga. 701, 702, 75 S.E.2d 417, 418.

"Under the evidence here there was admittedly and unquestionably a conspiracy among several persons to violate the laws of this State with reference to the sale of alcoholic beverages. It is equally certain that the defendants Park and Pinion were members of that conspiracy, and it is probable that others, including Seay, belonged to it.

"The State contends that Hoard's death was pursuant to or in furtherance of that conspiracy. It relies upon the rule that 'It is not necessary that the crime of murder should be a part of the original design; but it is enough if it be one of the incidental probable consequences of the execution of their design * * *' (Gore v. State, 162 Ga. 267(1)(a), 134 S.E. 36, 38), or if it is 'naturally or necessarily done pursuant to, or in furtherance of the conspiracy.' Handley v. State, 115 Ga. 584, 41 S.E. 992 (one Justice absent).

"The State urges that the evidence as a whole, and with all inferences and deductions therefrom, leads to the conclusion that the death of Hoard was deemed necessary to protect Park's illegal liquor operations and was in furtherance of the conspiracy to violate the liquor laws. It argues that Hoard's death was considered neces-

sary because he planned to present to the grand jury on the day of his death facts as to Park's activities.

"For support of this contention the State relies upon much of the foregoing evidence, including the following: that Hoard had instituted the padlock proceedings against Park; that he had caused the confiscation of Park's contraband alcohol; that he had filed criminal accusations against Park and others; that they had plead guilty and their fines totaling $6,300 had been paid by Park; that Park's liquor locations had not been in fact padlocked; that the contraband had not been destroyed; and that Funderburk intended to move back in 'the yellow house' in August.

"As we view the record, a conspiracy involving the defendant in the murder of Hoard was prima facie shown by such aliunde evidence, and the inferences and deductions therefrom.

"In view of such evidence as to conspiracy it follows that it was not error to permit Seay to testify as to the declarations made to him by Pinion that 'the old man won't go up any more' and that 'the old man was worried'; or as to Worley's statement to him that 'the old man' would harm him or his family if he did not participate.

"Accordingly, it was not error for Seay to testify that Pinion told him that he was working with Park in the liquor business. Nor was it error for him to testify that he knew when he was dealing with Pinion in June that he was dealing with him as agent of Park, since the basis for that statement was that Pinion had told him about Park's involvement in the conspiracy to kill Hoard."

The evidence at the second trial, which resulted in the affirmed conviction, followed that of the first trial except the State ran into several obstacles in its effort to develop the proof. For example Blackwell, the man who had placed the deadly bomb, who had testified at the first trial, and who had already re-

ceived a life sentence on a plea of guilty recommended in return for his willingness to testify, invoked his Fifth Amendment privilege against self incrimination and refused to testify at the second trial. Since he had been thoroughly cross-examined at the prior trial (by the same counsel who was participating in the second trial) Blackwell's recorded testimony was read to the jury.

Seay had been sentenced as had Blackwell. When called to the stand he likewise invoked the Fifth Amendment. Later on, he abandoned this position, did testify, and was most thoroughly cross-examined. Under cross-examination by defense counsel, he explained his original unwillingness to take the witness stand a second time by swearing that while in prison he had been offered $10,000 to repudiate his former testimony and that the safety of his wife and small children had been explicitly threatened. While being pressed by Park's counsel, Seay said that he had been offered $10,000 to repudiate his prior statement by one Nixdorf. He was asked if he would perjure himself to save his wife's life, to which he responded, "I'd do anything to save her life."

At another point, on cross-examination, he was asked, "Are you saying that Mr. Park over here threatened your wife?"

Answer. "Well, I'm saying that he sent Mr. Nixdorf down to see me, offer me money not to get back where I was, hire me any lawyers in the United States I wanted; Texas, Boston, anywhere * * * anything Mr. Nixdorf done is for Mr. Park. He's working for him; employed by him."

It is upon the above record, and in contravention of the reasoning of the Supreme Court of Georgia, that Park seeks habeas corpus, asserting that his conviction resulted from denial of his Sixth Amendment right to confront the witnesses against him.

In the District Court it was specifically stipulated by Park's counsel that the claimed violation of the Confrontation Clause, accomplished by admitting the

declarations of the non-testifying Pinion and Worley, is the only issue upon which there had been state exhaustion, thus ripe for federal habeas corpus disposition.

There is an important distinction between the instant case and Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). In Dutton's case, Section 38–306 of the Annotated Georgia Code was attacked on the ground that a part of its hearsay exception was constitutionally invalid in that it did not identically conform to the hearsay exception as applied to conspiracy trials in the federal courts, that is, the challenged statement in *Dutton* had been made *subsequently* to the commission of the homicide and while the alleged participants were attempting to conceal the identity of the actual murderers. Under federal conspiratorial exceptions to the hearsay rule the evidence could not have been admitted; under the Georgia statute, in a state trial, it was admissible. It was argued that this aspect of the Georgia statute violated the Confrontation Clause.

To this, in a plurality opinion, with one Justice concurring in the result, the Supreme Court responded, "Appellee does not challenge and we do not question the validity of the coconspirator exception [to the hearsay rule] in the federal courts."

Moreover, the Supreme Court in its *Dutton* decision pointed out that Evans [in that case] was not being prosecuted for conspiracy but for the substantive offense of murder, that is, one in which he, according to eye witness testimony, actively participated.

In the instant case, the declarations of Pinion and Worley were made prior to the murder and while efforts were being made to cause it. To be specific, this was a typical conspiratorial situation. It did not involve declarations of co-conspirators made after the crime was committed.

This remands us to an evaluation of the views of the Supreme Court of Georgia in Park's case. The opinion there defined conspiracy, under Georgia law, as "A corrupt agreement between two or more persons to do an unlawful act", 162 S.E.2d 364, thus the conspiracy does not have to be one which is, of itself, explicitly defined and punishable as an independent criminal offense.

The Georgia Court continued, "It is not necessary that the crime of murder should be a part of the original design; but it is enough if it be one of the incidental probable consequences of the execution of their design. * * * * [The existence of a conspiracy] may be established by direct proof, or by inference, as a deduction from acts and conduct, which discloses a common design on their part to act together for the accomplishment of the unlawful purpose. In other words, the existence of the common design or purpose between two or more persons to commit an unlawful act may be shown by either direct or circumstantial evidence."

The Court further concluded that, "a conspiracy involving the defendant in the murder of Hoard was prima facie shown by such aliunde evidence, and the inferences and deductions therefrom."

Thus, we repeat, the instant case falls clearly within the four corners of conspiracy cases frequently encountered in both state and federal courts in which the declarations of co-conspirators made during the existence and furtherance of the conspiracy are admissible as an exception to the hearsay rule. As will later be seen, this has been uniformly held not to infringe on Sixth Amendment confrontation rights.

■ Our Panel was of the view that "There was no independent, non-hearsay evidence of Park's participation in the plot to kill Solicitor General Hoard; there was independent evidence only of Park's participation in a conspiracy to violate the State's alcoholic beverage law." We cannot agree, for the evidence recited herein well supports the inference or deduction, which the jury accepted, that the killing was incidental to or in furtherance of the undisputed ongoing

liquor conspiracy and was inescapably a part of it, for without the former there would have been no motive or reason for the ultimate event. The liquidation of the Solicitor General could well have been accepted by criminal minds as the only way to keep the illegal liquor conspiracy alive. The only other possible motive, revenge for prior interference and heavy fines, would have been a direct descendant of and inseparably linked by common bonds to the original conspiratorial activities. That the beginning unlawful conspiracy inseparably merged in the murder to us seems to be inescapable. There was no "combination of two conspiracies", as mentioned in the panel opinion.

█ Nor can we agree, as the Panel thought, that the declarations of the alleged co-conspirators were unsupported by indicia of reliability. Quite evidently, as indicated by its verdict, the jury found beyond a reasonable doubt that the Pinion and Worley statements had been made, that "the old man", Park, was the only man anywhere near this situation who was possessed of enough funds to finance the assassination. It was Pinion, his enforcer, who, by his declaration, had to go see "the old man" to settle a demand for an increased fee, with reported negative results. After the deed was done, it was Pinion who travelled to Seay's home and threw the $5,500 on the bed, departing without saying a word. There is not a whisper in the record that Pinion personally had or, on his own, could marshal such resources. Hoard had cost "the old man" $21,700 in seized contraband and $6,300 in fines for himself and employees—compared to which a $5,000 hit fee would look relatively small, especially if it carried with it the hope of holding on to contraband not yet destroyed and of carrying on a rather major (and profitable) illegal operation in a dry county.

In the context of this case we attribute no constitutional significance to the failure of the State to call Pinion and Worley to the stand. Both men had denied their complicity in the murder.

They had stood trial on it, maintaining their innocence. They were nevertheless convicted. It would have been a strange expectation, indeed, to anticipate that, if called, they would abandon their steadfast position and render assistance to those who had succeeded in consigning them to the penitentiary for life. Moreover, it is an inescapable assumption that counsel for the State and for Park knew what happened at the trials of these men. With this knowledge, neither side bothered to put either of them under subpoena. Even Blackwell and Seay, who had made their peace with the State in return for a life sentence, invoked the Fifth Amendment at the second trial, from which Blackwell never wavered, although Seay did withdraw from that position and took the stand.

The determinative point, as later developed, is that Seay was the only witness to the out of court statements of Pinion and Worley and as to this he was thoroughly cross-examined.

In the context of that already written, we turn to a discussion of some principles of controlling law, applicable to cases such as this one. In doing so, there is no intention to rake the field or to attempt a treatise on the Confrontation Clause, or the law of conspiracy, or exceptions to evidentiary hearsay rules. What does appear is that the Georgia law applicable to cases of this kind completely tracks the federal law in such instances; we are unable to discern the first relevant distinction between the two.

█ The common law offense of conspiracy has not been incorporated in the Georgia Criminal Code, yet that Code specifically acknowledges the existence of conspiracies in Section 38–306, *supra,* by providing that "After the fact of conspiracy shall be proved, the declarations by any one of the conspirators during the pendency of the criminal project shall be admissible against all". It has been well established by numerous Georgia cases that despite the failure of the Code to denounce the common law of-

fense of conspiracy, a conspiracy may nevertheless be an incident of and one of the means by which a substantive crime may be accomplished, including the crime of murder. For a detailed history and analysis of this legal proposition see Weeks v. State, 66 Ga.App. 553, 18 S.E.2d 503 (1942), and the cases there discussed.

■ We are thus convinced that the application of the standard exception to the hearsay rule as to conspiracies in this case did not depend upon the existence of a statute making conspiracy a crime in and of itself. This view is bolstered by the plain federal law on the subject, the constitutionality of which seems never to have been successfully challenged.

■ Indeed, the admissions and statements of a co-defendant are admissible as against the other defendant, even in the absence of a conspiracy count, *where there is independent evidence of a concert of action.* Clearly, once such concert of action is independently shown, hearsay statements in furtherance of that relationship are admissible in evidence, United States v. Williams, 9 Cir., 1970, 435 F.2d 642. The threshold requirement for admissibility is satisfied by a showing of a likelihood of an illicit association between the declarant and the defendant, United States v. Ragland, 2 Cir., 1967, 375 F.2d 471. The independent evidence of illicit association may be totally circumstantial, United States v. Garguilo, 2 Cir., 1962, 310 F.2d 249; United States v. Ragland, *supra.*

In United States v. Williams, *supra,* 435 F.2d at page 645, the Court cited United States v. Olweiss, 2 Cir., 1943, 138 F.2d 798, 800, cert. denied, 321 U.S. 744, 64 S.Ct. 483, 88 L.Ed. 1047 (1943), in which Judge Learned Hand stated:

"It was proper to charge them as principals—which they probably were in any event—even though they were only accessories. (§ 550, Title 18, U.S. C.A.); and any evidence admissible against Olweiss was admissible against them, so far as 'it consisted of conduct in furtherance of the joint venture in which all three were engaged. The

notion that the competency of the declarations of a confederate is confined to prosecutions for conspiracy has not the slightest basis; * * *."

■ The common design which is the essence of conspiracy may be made to appear when the parties steadily pursue the same object, whether acting separately or together by common or different means, ever leading to the same unlawful result, United States v. Gordon, 7 Cir., 1944, 138 F.2d 174, cert. denied, 320 U.S. 798, 64 S.Ct. 266, 88 L.Ed. 481. Presenting evidence of violations of different statutes does not create separate conspiracies out of one conspiracy. The gist of the matter is an agreement to commit unlawful acts, United States v. Noah, 9 Cir., 1973, 475 F.2d 688. Of critical importance, the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by *looking at it as a whole,* Carlson v. United States, 10 Cir., 1951, 187 F.2d 366, cert. denied, 341 U.S. 940, 71 S.Ct. 1000, 95 L.Ed. 1367.

■ A conspiracy is a partnership in crime and so long as that partnership continues the partners act for each other in carrying it forward; an overt act of one partner may be the act of all even without any new agreement specifically directed to that particular act, Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).

■ Participation in a criminal conspiracy may be shown by circumstantial as well as direct evidence, Delli Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957). A party's stake in an alleged conspiracy is relevant to the question of whether he participated therein, Direct Sales Co. v. United States, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943).

■ Once the existence of the common scheme of a conspiracy is shown, slight evidence is all that is required to connect a particular defendant with the conspiracy, United States v. Lee, 5 Cir., 1973, 483 F.2d 968.

■ Conspiracy is almost always a matter of inference deduced from the acts of the persons accused, which are done in pursuance of an apparent criminal purpose, and proof need go no further than reach that degree of probability where the general experience of men suggests that it has passed the mark of reasonable doubt, Blumenthal v. United States, 9 Cir., 1947, 158 F.2d 883, affirmed 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154.

■ From the foregoing, we are totally convinced that the theory upon which Georgia prosecuted Park and upon which the jury convicted him is legally unassailable.

This leaves only the question of whether the conviction was obtained at the expense of the Confrontation Clause of the Sixth Amendment, a fundamental right made obligatory on the states by the Fourteenth Amendment, Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

The general facts and circumstances of the conspiracy which led to the murder were developed by live witnesses, duly subjected to cross-examination, presenting no issue of confrontation.

■■ The confrontation attack is centered upon the admission, through the testimony of Lloyd Seay, of statements made by co-conspirators Douglas Pinion, and George Worley before the murder was committed. As to this, Seay was subjected to the most rigorous and searching cross-examination. This is exactly what the Confrontation Clause guarantees, see, e. g., Nelson v. O'Neil, 402 U.S. 622, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971). A conspirator's declaration in furtherance of the conspiracy may be used against another conspirator not present on the theory that the declarant is the agent of the other, and the admissions of one are admissible against both as a standard exception to the hearsay rule, Delli Paoli v. United States, supra; Lutwak v. United States, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953). The issue was whether Pinion and Worley

had made the statements. Seay was the only witness who swore that they had. He was cross-examined at length and in detail. That puts an end to the confrontation argument in this case.

We need not linger long over certain issues not reached by the Panel in its decision.

■ After they had invoked the Fifth Amendment at the second trial, there was no error in the use of the transcripts of the testimony of Blackwell and Seay given at the former trial in which both had been cross-examined by the same defense counsel who appeared at the second trial, United States v. Mobley, 5 Cir., 1970, 421 F.2d 345.

■ The use of Blackwell's confession is no cause for intervention in this case as it nowhere mentioned the defendant Park, White v. United States, 5 Cir., 1969, 415 F.2d 292.

The judgment of the District Court denying the appellant Park habeas corpus relief is

Affirmed.

Since Park is now at large on bail, pending the outcome of this appeal, the mandate will issue

Forthwith.

GEWIN, Circuit Judge (concurring specially):

Reluctantly, I concur in the result reached by the majority in this case. In my view, this special concurrence is impelled by the Supreme Court's plurality opinion in Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), and the decision of this court en banc in Hoover v. Beto, 467 F.2d 516 (1972), cert. denied, 409 U.S. 1086, 93 S.Ct. 703, 34 L.Ed.2d 673. Were it not for those two decisions, I would join with my dissenting Brothers.

The plurality opinion in Evans concluded that no error was committed in the trial of Evans on a capital offense when the state was allowed to prove by a witness named Shaw that Williams, a co-conspirator with Evans, made the statement, "If it hadn't been for that

dirty son of a bitch Alex Evans, we wouldn't be in this now." The Court concluded that the Georgia hearsay statute and Georgia decisions authorized the admissibility of the statement. Some of the Justices seemed to assign as an additional reason for admissibility the fact that the statement by Williams "did not misrepresent Evans' involvement in the crime." Two Justices thought the admission of the statement was harmless error because it was "so incredible that the testimony must have hurt, rather than helped, the prosecution's case." It is rather significant that four Justices concluded that the Georgia rule satisfied the right of confrontation (opinion of Justice Stewart concurred in· by Chief Justice Burger, Justices White and Blackmun). Four other Justices disagreed with that conclusion (opinion of Justice Marshall, concurred in by Justices Black, Douglas and Brennan). The deciding vote was cast by Justice Harlan who refused to apply Sixth Amendment standards to the Georgia statute and Georgia decisions interpreting it, but considered the question as posing an issue of due process. It seems fair to say that there is no clear holding of the Court except as to the result reached.

It is interesting to note that at the time of trial, the witness Williams was in the custody of the state of Georgia and easily available to the state. The murder for which Evans was being tried had been committed for over a year. The purpose of the conspiracy had been accomplished. The facts were known, and therefore, the statement by Williams could not have aided in the concealment of the conspiracy. Indeed, Truett, a participant in the murder, who had been granted full and complete immunity and was the principal prosecution witness, testified fully as to Evans' involvement. As the court stated in Fiswick v. United States, 329 U.S. 211, 217, 67 S.Ct. 224, 227, 91 L.Ed. 196, 200 (1946), "[C]onfession or admission by one co-conspirator after he has been apprehended is not in any sense a furtherance of the criminal enterprise. It is rather a frustration of

it." Nevertheless, the plurality opinion in Evans sustains the admissibility of the statement under the Georgia rule which allows such evidence because it is deemed to be in furtherance of the conspiracy or in concealment of it. Whether the statement be considered incredible as some of the Justices seemed to think or as a true representation of Evans' involvement in the crime as others apparently thought, it is surely not complimentary of a defendant standing trial on any charge, especially a capital offense, to be characterized as "a dirty son of a bitch" and to be accused as the person who caused the trouble.

Similarly, this court in Hoover permitted the state to introduce into evidence the confession of Calvin Sellars, one of the principals involved, through the mouth of Officer C. V. Stone. Officer Stone was allowed to testify as to what Sellars had said to him, which seriously implicated Hoover even though Sellars was not shown to be unavailable to the state as a witness.

If the hearsay statement made by Williams was admissible against Evans and if the hearsay statement made by Sellars was admissible against Hoover, notwithstanding the confrontation provision of the Sixth Amendment, I am compelled to concur in the result reached by the majority which approves the admission of damaging hearsay statements by witnesses who never confronted Park.

Although I feel bound to concur in the result reached by the majority, I must pause to pay some obeisance to the confrontation clause. Except for the cases cited, I could not agree that an accused can be deprived of the right to confront and be confronted by the witnesses against him. The confrontation clause of the Sixth Amendment arose out of ominous circumstances in the history of the common law. In 1586, Mary, Queen of Scots, was convicted in a star chamber proceeding chiefly on documentary evidence which she claimed was forged, but she was unable to interrogate those who had written the documents. Sir Walter

Raleigh[1] was convicted upon hearsay evidence in 1603 and ultimately executed fifteen years after trial. He pled for the right of confrontation in these words:

> "If I knew any of these things, I would absolutely confess the indictment and acknowledge myself worthy a thousand deaths. Why, then, my Lords, let my accuser be brought and let me ask him a question and I have done; for it may appear from his own relation that his accusation cannot be true, or he may be discovered by examination. If you condemn me upon bare inferences and will not bring my accuser to face, you try me by no law, but by a Spanish inquisition. If my accuser were dead or out of the realm, it were something; but my accuser lives and is in the house, and yet you will not bring him to my face."[2]

Raleigh's plea was made a vital part of our law in the Sixth Amendment.

Moreover, since I am bound by the result reached in *Evans* and in *Hoover,* there is another reason why I am constrained to concur in the result of the majority, even if I would not do so absent the two decisions mentioned. There yet remains in our law a viable principle which requires respect for the decisions of the highest tribunals of a state once it is concluded that a Constitutional issue is not presented. It is a hazardous undertaking for federal courts to overturn the conclusion of state courts unless the Supremacy Clause requires such action.

In Avery v. Alabama, 304 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377 (1939) the defendant was convicted of murder, sentenced to death and his conviction was affirmed by the Supreme Court. Avery was tried in 1938 for a murder alleged to have been committed in 1932. He was arraigned on Monday; two practicing attorneys were appointed to defend him; pleas of not guilty and not guilty by reason of insanity were entered and the case was set for trial on Wednesday. The case was not reached on Wednesday but the trial actually commenced on Thursday. Appointed counsel moved for a continuance on the ground they had not had sufficient time and opportunity to investigate the case and prepare a defense. One of the appointed attorneys supported the motion for continuance on the ground that he had been substantially engaged in court on Monday, Tuesday and Wednesday. Under these facts the Supreme Court concluded:

> "Under the circumstances of this case we cannot say that the trial judge, who concluded a fairly conducted trial by carefully safeguarding petitioner's rights in a clear and fair charge, deprived petitioner of his constitutional right to assistance of counsel. The Supreme Court of Alabama having found that petitioner was afforded that right, its judgment is Affirmed."

308 U.S. at 453, 60 S.Ct. at 325, 84 L.Ed. at 383.

Again in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Court evidenced a profound respect for the judgment of a state appellate court. In *Brady* it is important to remember that the Court only held that the suppression of the accomplice's confession violated the due process clause of the Fourteenth Amendment. The Court also concluded that neither the due process clause nor the equal protection clause of that amendment was violated by restricting the new trial, which it ordered, to the question of punishment only. Justice Douglas aptly stated:

> "We usually walk on treacherous ground when we explore state law, for state courts, state agencies, and state legislatures are its final expositors under our federal regime." (footnote omitted)

373 U.S. at 90, 83 S.Ct. at 1198, 10 L.Ed.2d at 220.

WISDOM, Circuit Judge, with whom GOLDBERG, GODBOLD, SIMPSON and RONEY, Circuit Judges, join, dissenting:

I reaffirm the views expressed in the panel opinion. 5 Cir., 493 F.2d 923. I

---

1. *See* F. Heller, The Sixth Amendment 104 (1901).

2. R. Raby, Fifty Famous Trials 17 (1937).

join in my brother Thornberry's dissenting opinion. I add a few words of my own because the majority opinion shows an egregious misunderstanding of the Confrontation Clause.

The only links between Park and the murder are the hearsay statements Pinion and Worley are supposed to have made to Seay. The majority opinion blithely dismisses the significance of this fact in one paragraph with a quick wave of the pen:

> "As to this, Seay was subjected to the most rigorous and .searching cross-examination. This is exactly what the Confrontation Clause guarantees."

Incredible! Of course, what the Confrontation Clause guarantees is Park's right to examine Pinion and Worley—not just Seay.

Continuing on its errant way, the majority states:

> "The issue was whether Pinion and Worley had made the statements. Seay was the only witness who swore that they had. He was cross-examined at length and in detail. That puts an end to the confrontation argument in this case."

But the issue was *not* whether Pinion and Worley had made the statements. They may have done so. They may have wished to lighten their burden by shifting the heaviest part of it to someone else; Park was a logical choice. The issue was the truth or falsity of their statements. Park was entitled to confront these accusers. The United States Constitution guarantees him this right, regardless of the willingness of Georgia courts to admit the statements by attenuating the co-conspirator exception to the bar against hearsay.

The utility of an exception to the rule against hearsay depends on the reliability of the hearsay and the need for such evidence. The reliability of a co-conspirator's out-of-court statement is shaky at best. It is shakier when the only conspiracy proved was to commit a misdemeanor, here to sell liquor in a dry county. To allow Park to be found guilty of murder on the crucial, devastating out-of-court statements of two men who were never brought into court to testify, although they were in prison and therefore available to testify, shocks me. I doubt that this could happen in any other civilized country. I had thought that it could not happen here.

THORNBERRY, Circuit Judge, with whom WISDOM, GOLDBERG, GODBOLD, SIMPSON and RONEY, Circuit Judges, join, dissenting:

I cannot subscribe to the majority opinion's analysis and respectfully register my dissent.

The majority opinion properly looks to the Georgia court decisions in this case to determine the elements of proof required to convict Park of murder. Yet the opinion does not follow that analysis through to its logical conclusion. The net result is an opinion that, in my view, ignores the very first principles of the Supreme Court's confrontation clause decisions.

The Georgia Supreme Court's first opinion attempts to set out the elements of proof under Georgia law required to convict Park. Park v. State, 224 Ga. 467, 162 S.E.2d 359 (1968). It is clear that the State's theory of the case was that the murder was committed in furtherance of the liquor conspiracy. Under that theory, the State had only to show beyond a reasonable doubt that Park participated in the liquor conspiracy. Then, applying the principle of Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), Park was guilty of murder without regard to his actual knowledge of or his active participation in the murder plot.

Arguably the Georgia Supreme Court adopted the State's theory, and the majority opinion here apparently construes the state court opinion in that fashion. Under that theory, I do not feel this case presents a significant confrontation problem. There was a wealth of evidence to connect Park with the liquor conspiracy. If the State could obtain a murder conviction merely by showing

Park's connection with the liquor conspiracy, then Pinion's statements were neither "crucial" to the prosecution's case nor "devastating" to Park's defense. The case would present a confrontation question very similar to Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 276 L.Ed.2d 213 (1970), and I would think the confrontation question here properly resolved under the rationale of the *Dutton* plurality, or on a harmless error theory.

I think Park might raise due process objections to the validity of his murder conviction on the *Pinkerton* theory. *See* Developments in the Law—Conspiracy, 72 Harv.L.Rev. 920, 993–98 (1959). However, as the majority notes, the confrontation clause issue is the only question ripe for habeas corpus disposition, and Park should first present any due process arguments to the Georgia courts.

My reading of the Georgia Supreme Court opinion, however, convinces me that the Georgia Supreme Court required proof of Park's connection with the murder plot for conviction. The court rejects Park's claim of entitlement to a directed verdict of acquittal on the basis that there was evidence of Park's participation "*in a conspiracy to murder Hoard.*" Park v. State, 224 Ga. 467, 468, 162 S.E.2d 359, 361 (1968). Further the court required corroboration of Seay's testimony since he was an accomplice to the murder. In summarizing the evidence on corroboration the court states, "The evidence relied upon by the State as corroborating the testimony of the accomplice Seay tended to connect Park with the murder and was sufficient to support his conviction." 224 Ga. at 477, 162 S.E.2d at 366. If the Georgia court only required proof of Park's participation in the liquor conspiracy, corroboration of Seay's testimony would not be essential to sustain the conviction.

If the Georgia opinion required proof of Park's participation in the murder plot, then I feel this case presents a confrontation problem significantly different from *Dutton.* The out of court statements of Pinion and Worley provided the only evidence linking Park to the *murder* conspiracy. The Georgia Supreme Court's decision there allowed the State to use out of court statements against Park to establish an essential element of its case. Those statements were clearly crucial to the prosecution's case, and Park never had the opportunity to confront and cross-examine the makers of those statements.[1]

The majority feels the confrontation clause requirements are met here. The opinion states:

> The confrontation attack is centered upon the admission, through the testimony of Lloyd Seay, of statements made by co-conspirators Douglas Pinion, and George Worley before the murder was committed. As to this, Seay was subjected to the most rigorous and searching cross-examination. This is exactly what the Confrontation Clause guarantees, see, e. g., Nelson v. O'Neil, 402 U.S. 622, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971).

I most vigorously disagree. Park's opportunity to cross-examine Seay does *not* satisfy the confrontation clause. Seay did not make the inculpatory statements, and therefore cross-examining him as to their meaning is fruitless. It is Pinion and Worley who are the witnesses against Park for Sixth Amendment purposes. The situation in Nelson v. O'Neil was completely different. There, Runnels, the out of court declarant, took the stand, and was subject to cross examination. Here Pinion and Worley, the makers of the extrajudicial statements, never testified, and could not be examined as

---

1. As the panel opinion noted, Pinion and Worley were not shown to be unavailable. Each had either exhausted his appellate remedies, or failed to appeal his murder conviction. I do not believe that either man could validly have claimed a fifth amendment privilege. The mere possibility of future collateral attack should not give rise to a valid claim of privilege after final conviction. *See* Reina v. United States, 364 U.S. 507, 513, 81 S.Ct. 260, 5 L.Ed.2d 249 (1960); United States v. Romero, 249 F.2d 371, 375 (2d Cir. 1957); 8 Wigmore, Evidence § 2279 (McNaughton Rev. 1961).

to their perception, memory, narration, and sincerity. *See* Morgan, Hearsay Dangers and the Application of the Hearsay Concept, 62 Harv.L.Rev. 177, 218 (1948). The majority feels that Seay's status as a co-conspirator makes him the agent of Pinion and Worley. The majority reasons that Park's opportunity to cross-examine the "agent" was the confrontation clause equivalent of cross examining the declarants. This is a novel confrontation clause concept to which I do not subscribe.

I think Judge Wisdom's panel opinion makes the proper confrontation clause analysis in this case. For the reasons given in that opinion, I would reverse the district court's denial of Park's habeas corpus petition.